**STATE of Missouri, Respondent,**

v.

**Paul KREUTZER, Appellant.**

No. 77041.

Supreme Court of Missouri,
En Banc.

Aug. 20, 1996.

Rehearing Denied Sept. 17, 1996.

Craig A. Johnston, Asst. Public Defender, Columbia, for Respondent.

Jeremiah W. (Jay) Nixon, Attorney General, John M. Morris, Assistant Attorney General, Jefferson City, for Respondent.

COVINGTON, Judge.

A jury convicted appellant Paul W. Kreutzer of murder in the first degree, section 565.020, RSMo 1986, and returned a sentence of death. The trial court fixed punishment at death. The postconviction court overruled appellant's Rule 29.15 motion. The judgments are affirmed.

## THE CASE

The evidence is viewed in the light most favorable to the verdict. *State v. Six,* 805 S.W.2d 159, 162 (Mo. banc), *cert. denied,* 502 U.S. 871, 112 S.Ct. 206, 116 L.Ed.2d 165 (1991). Thirty-six-year-old Louise Hemphill lived with her husband and three children in Pike County near Louisiana, Missouri. Appellant lived less than a quarter of a mile from the Hemphill residence with his adoptive parents. Appellant was paroled from prison in Illinois in May of 1992 and returned to Pike County to live with his family. Later that year appellant met Louise Hemphill when he went to the Hemphill residence to look at a horse that was for sale. In the last week of August, appellant was arrested and later released in Columbia, Missouri, on a charge of indecent exposure.

On the morning of September 2, 1992, Louise Hemphill's husband left for work, and the two oldest children left for school. Mrs. Hemphill drove her youngest child to school. Later in the morning, Mrs. Hemphill's brother went to the Hemphills' home. He was the last person to see her alive. Mrs. Hemphill customarily made a list of household tasks for the day, with a time deadline by which she sought to complete each job. When the police later discovered the list, the chore with the time of 10:30 a.m. was crossed out, but the one listed for 11:00 a.m. was not.

The same morning, appellant was observed in a number of locations in the vicinity of the Hemphill residence. He was seen pulling into a driveway adjacent to the school to which Mrs. Hemphill had earlier driven her daughter. Appellant visited two area schools and offered to speak to students about the

dangers of drugs and alcohol. Appellant bought a BB gun at a store in Louisiana, Missouri, at 9:41 a.m. He attempted to purchase BB's for the gun but did not have enough money for the purchase.

Around 4:00 p.m., the two Hemphill daughters, Janie and Jessie, arrived home from school. Jessie Hemphill went upstairs and discovered her mother's nude body lying on the floor of her brother Luke's bedroom. Jessie telephoned her father, who returned home, saw the body, and called 911.

According to the psychologist who interviewed appellant, appellant asked for Mr. Hemphill when he went to the Hemphill residence on September 2. Mrs. Hemphill came to the door and told appellant her husband was not at home. When Mrs. Hemphill tried to shut the door, appellant forced his way into the house. Investigating officers observed signs of a sexual assault in the upstairs bedroom occupied by Jessie and Janie Hemphill. Lengths of duct tape were wrapped around the head and foot of one of the beds, and pieces of duct tape remained around Mrs. Hemphill's ankles. Mrs. Hemphill's clothing and a pair of sweatpants were on the floor next to the bed. A hair discovered on the sweatpants was consistent with appellant's pubic hair and inconsistent with the hair of any member of the Hemphill family. Bloodstains on the bed cover and sweatpants matched the blood of the victim and appellant. DNA analysis of semen found on the bed cover and on Mrs. Hemphill's face and pubic area established a genetic match with appellant, with a band pattern that occurs once every 150,000 times in the Caucasian population and once every 500,000 times in the African–American population.

At some point Mrs. Hemphill escaped or appellant released her from her bonds. The door to the master bedroom was found kicked in, with the door lock lying on the bedroom floor. Boot prints on the door were similar in sole pattern to the boots later seized from appellant at the time of his arrest. The Hemphills kept a .22 caliber pistol in a closet in the upstairs hall, with the ammunition normally stored in a bathroom adjoining the master bedroom. After the murder, officers found the weapon unloaded in the master bathroom.

Mrs. Hemphill suffered multiple injuries. Appellant stabbed her in the neck, opening a jugular vein. Bloodstains and duct tape were discovered in the bathroom and master bedroom, apparently tracked in by Mrs. Hemphill as she ran from the bathroom. Appellant struck Mrs. Hemphill in the head at least three times with a baseball bat kept in her son's room. The blows from the bat were so severe that they dislocated a vertebra in Mrs. Hemphill's neck. Brain matter was leaking from the wound. Although the head injuries would have been fatal, the immediate cause of death was strangulation. Appellant looped a belt around Mrs. Hemphill's neck and strangled her. The strangulation probably took from three to four minutes to complete. Mrs. Hemphill may have been conscious for one or two minutes. A bloodstained hunting knife, kept in the Hemphills' kitchen, was found lying on Mrs. Hemphill's body. Her purse was missing from the house.

Police apprehended appellant on the evening of September 2. Officers who searched appellant's car recovered, among other things, the victim's billfold-purse, a pair of gloves with human bloodstains on it, a roll of duct tape, and the BB gun appellant had purchased that morning along with a package of BB's and a receipt for their purchase. A search of the motel room where appellant stayed revealed, among other things, a pair of jeans with human bloodstains and a receipt for the purchase of the BB gun. Police also seized appellant's boots and ninety-seven dollars in cash from appellant's person. Soon after police searched appellant's car, a law enforcement officer placed appellant in custody.

In the guilt phase of the trial, appellant relied on a defense of diminished capacity, claiming that he suffered from a mental disease or defect that prevented him from acting with deliberation. See § 552.015.2(8), RSMo 1986. In the penalty phase, appellant presented witnesses in mitigation including a woman who, on the night of the murder, was aided by appellant when she was stranded on the road with a flat tire. Appellant also

called his former landlord and her daughter, both of whom lived in the same apartment building as appellant for one year. A psychologist testified that appellant suffered from post-traumatic stress disorder and borderline personality disorder as a result of past physical and emotional abuse. The jury returned a sentence of death, finding that the evidence established the following statutory aggravating circumstances: that appellant committed the murder while engaged in the perpetration of the felony of burglary, section 565.032.2(11), RSMo 1986; and that appellant committed the offense of murder in the first degree for the purpose of receiving money or any other thing of monetary value for himself from Louise Hemphill, section 565.032.2(4), RSMo 1986.

## VOIR DIRE

Appellant raises a number of complaints related to the limitations the trial court imposed during appellant's questioning of the venire.

■ Prior to the commencement of voir dire, appellant moved to question the venire with regard to the issues of mental disease or defect and diminished capacity in groups smaller than those before which the general voir dire would be conducted. The court overruled the motion. Appellant claims error. The decision to conduct voir dire either individually or in small groups is a matter within the control of the trial court. Absent a showing of both an abuse of discretion and prejudice to the defendant, it is not a basis for the reversal of a conviction. *State v. McMillin*, 783 S.W.2d 82, 94 (Mo. banc), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). The trial court did not abuse its discretion in overruling appellant's motion.

Appellant's remaining challenges may be categorized and addressed by subject matter. Review is for abuse of discretion. "Although wide latitude should be permitted in exploring possible grounds for challenges for cause or peremptory strikes, the nature and extent of the questions counsel may ask are discretionary with the court." *McMillin*, 783 S.W.2d at 94. "The party asserting abuse has the burden of demonstrating a real prob-

ability that he was thereby prejudiced." *State v. Gray*, 887 S.W.2d 369, 382 (Mo. banc 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1414, 131 L.Ed.2d 299 (1995).

■ Appellant alleges that the trial court improperly limited and "continually thwarted" his attempts to question members of the panel in three specific areas: their prejudices concerning the defense of diminished capacity; their attitudes and feelings about the death penalty; and their expectations and beliefs regarding appellant's right not to testify. The limitations on voir dire, appellant contends, violated his right to an impartial jury under the Fourteenth Amendment to the United States Constitution. "Without an adequate voir dire," appellant claims, "the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled," citing *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). Appellant claims that the restrictions the trial court imposed prevented him from discovering facts that could have formed bases for his challenges for cause to venirepersons, as well as "such facts as might be useful to him in intelligently determining his peremptory challenges," citing *State v. Brown*, 547 S.W.2d 797, 799 (Mo. banc 1977).

The trial court sustained the state's objections to the following questions on issues touching upon the prospective juror's attitudes about a diminished capacity defense:

Q: [Asked to the panel as a whole after a venireperson indicated she could not overcome her belief that diminished mental capacity is not a defense to criminal acts]: Who else here feels the same way?

. . . .

Q: [Asked to a venireperson who indicated he would burden the defendant with proving his own innocence] I'm trying to put it on a scale like grades in school, and we would have to have an A case, wouldn't we?

A: Maybe 90 would help.

Q: Ninety percent. Okay. Anybody else who agrees with [that]?

. . . .

Q: Do you think that [childhood problems] have any influence at all on a mental state of a person later on in life?

. . . .

Q: [Asked to the panel as a whole after one venireperson indicated that he could not be impartial or follow the court's instructions in light of the sexual overtones of the case]

... Is there anybody else that feels the same way?

[Objection as to improper voir dire sustained]

Q: Let me ask the question this way. Is there anybody here who feels based on what they've heard already that they've made up their mind about whether or not Paul Kreutzer is guilty of murder in the first degree?

. . . .

VENIREPERSON: From what you've already said, I have already pretty well drawn the conclusion that he's guilty, and now you want to get him off on mental defect defense....

Q: Let me ask you this. When you say get him off, what do you mean?

. . . .

VENIREPERSON: And I would be very difficult to convince that a person isn't guilty of first degree murder if they knowingly act, if they did it.

Q: Well, there's a difference between knowingly, and if they did it.

. . . .

Q: [To a venireperson who had indicated he had worked for the Department of Corrections for twenty years.] ... Have you ever had any involvement with inmates who had raised mental defenses?

. . . .

Q: Can you listen to the judge's instructions and follow his instructions regarding that state of mind? Even though we are saying that Mr. Kreutzer went into the home, did the acts which caused the death of Louise Hemphill, can you still follow the judge's instructions that he might not be guilty of murder in the first degree?

. . . .

Q: If the judge instructs you that there's a certain state of mind that's required for a finding of guilty of murder in the first degree, and that instruction varies from what your thoughts and attitudes are, can you still follow the judge's instruction?

. . . .

Q: How do you feel about lawyers coming into court and saying the defendant committed a crime but he's using a mental defense, he's saying there was something wrong with it[?]

. . . .

Q: What do you think about lawyers saying, well, my client committed the crime, but he wasn't in the right state of mind?

. . . .

Q: I'm not a psychology doctor or a psychiatrist. They know much, much more about that than I ever will. They have a certain expertise. When I listen to them talk or explain things, I give certain deference to them about their expertise.... But I decide what I think based on whether or not they've made a point that I think is legitimate or not. Do you think you can do that?

. . . .

Q: [Asked following a venireperson's statement that he did not feel that "insanity is a reason to kill somebody"] I wouldn't disagree with you about that. But let me ask if there's anybody else on the panel that feels as Mr. Thomas does.

. . . .

Q: [Asked following a venireperson's statement that she would require the defendant to prove his mental defense beyond a reasonable doubt.] Miss Masek, is the same thing true with you?

. . . .

Q: Well, the judge will instruct you as to what a mental disease or defect is, ladies and gentlemen. And if you'll give me just a moment, I'll read that instruction to you.

. . . .

Q: Do you have any prejudice against the use, not of insanity, but against a mental disease or defect defense in a case like this?

. . . .

Q: Do you think [personality and upbringing] have a place in deciding whether or not a person has the mental ability to conform to the law?

. . . .

Q: Will you consider the way the person was brought up and what they learned and how they learned to be a person in this world?

. . . .

Q: Does impartial mean to you that you would make us prove that the defendant was not in the state of mind that the State is required to prove?

. . . .

Q: Could you consider [psychological evidence] and consider whether or not he had a mental disease or defect in reaching your decision, your verdict?

The trial court sustained objections to the following questions, all concerning the venire's beliefs regarding the death penalty:

Q: We're not in the courtroom, I walk up to you in a coffee shop, maybe I know you, and we sit down and we start talking, and we see in the paper that a death penalty has been carried out. And I say to you, what do you think of the death penalty, what are you going to tell me?

. . . .

Q: . . . [Y]ou've heard the terms before, eye for an eye and that type of thing?

A: Yes.

Q: What's your feeling about those statements like that?

. . . .

Q: Do you agree with the statement, life for a life, an eye for an eye?

. . . .

Q: What I'm asking is do you disagree or agree with the proposition of law that makes the State have you as a juror, whole jury agree on all or any of the aggravating factors unanimously, but the law doesn't make us have you all agree on the mitigating factors unanimously, that there could be twelve different mitigating factors sufficient to outweigh the death penalty, but that the aggravating factors must all be agreed upon. Do you think that's okay?

Q: [After objection was sustained] Do you agree with that as a proposition of law, sir?

. . . .

Q: We'll give the mitigating factors, which are reasons to vote for life imprisonment without parole. The jury doesn't have to be unanimous about the mitigating factor. They have to be unanimous about the aggravating factors, but they don't about the mitigating factors. What are your thoughts on that?

. . . .

Q: . . . [D]oes everybody understand that he will get the death penalty if you vote for that, and if the jury comes back, twelve people agree unanimously beyond a reasonable doubt to invoke the death penalty, that he will receive it? Does anybody have any doubts or questions about that?

. . . .

Q: Have you ever expressed an opinion about the death penalty before?

A: Probably.

Q: Do you remember what you said, or can you recall or reconstruct what you said?

. . . .

Q: [Explaining the penalty phase to the venire] Then the next step is does that aggravating factor or do those aggravating factors warrant the imposition of the death penalty. And warrant is an important word because that's what each of you decide if they've proven all of those things beyond a reasonable doubt. Does what they've proven warrant the death penalty beyond a reasonable doubt, and that's another step.

. . . .

Q: Do you agree with [two other venirepersons who indicated that they would require that defendant prove beyond a reasonable doubt that he should live]?

A: Yes, sir.

State: Your Honor, I'm going to object to these continual questions about whether someone agrees with someone else.

The court: Objection will be sustained.

. . . .

Q: Okay. Mr. Barnes, I understand that the defendant doesn't necessarily have to do anything. But understanding that if we reach that stage, we're going to do everything that we can do. Are you going to make us prove beyond a reasonable doubt that he should live?

. . . .

Q: Assuming that you found a person guilty of murder in the first degree, you found this person guilty of murder in the first degree, premeditated murder, would that in and of itself determine in your mind what the punishment should be?

. . . .

Q: Essentially, [aggravating factors] is a list that we've been given through the various processes in our state to give us the laws, the legislature, courts, things like that. But this is a written list.

. . . .

Q: And if as a jury all twelve of you find the existence of an aggravating circumstance, . . . could you still consider a verdict of life without the possibility of parole?

A: No, I don't believe so.

Q: Okay. Why don't you believe so?

. . . .

Q: If as a member of this jury the jury did find the existence of an aggravating circumstance and they were unanimous as to that one, could you consider returning a verdict of life without the eligibility of probation or parole simply to be merciful?

. . . .

Q: Would you require me to give you reasons not to kill [the defendant]?

A: Yes, ma'am.

Q: You would? Okay. Can you think of the kinds of reasons you would need in order not to kill [the defendant]? Can you tell me how much you would need me to give you?

. . . .

Q: But you would require me to give some reasons [not to impose the death penalty]?

A: Yes, ma'am.

Q: I think I asked [either of two other panel members] if you had to put it on a percentage, how big?

. . . .

Q: Do you have the capability to hear no evidence from us and still grant him mercy and give him life imprisonment?

In none of the quoted instances did the trial court abuse its discretion. The court permitted appellant extensive questioning on the issues concerning mental defect and diminished capacity defenses, as well as on the panel's attitudes regarding the death penalty. The court sustained objections only when appellant's counsel: 1) presented specific fact scenarios the answers to which arguably constituted obtaining a commitment from the venirepersons, *see State v. Twitty,* 793 S.W.2d 561, 565 (Mo.App.1990) (citing *State v. Roberts,* 709 S.W.2d 857, 865 (Mo. banc), *cert. denied,* 479 U.S. 946, 107 S.Ct. 427, 93 L.Ed.2d 378 (1986)) ("[C]ounsel may not extract a commitment from a venireperson to a particular course of action."); 2) asked open-ended questions about how prospective jurors "felt" or "thought" about certain issues, or to compare one venireperson's beliefs to another's, *see State v. Bannister,* 680 S.W.2d 141, 145 (Mo. banc 1984), *cert. denied,* 471 U.S. 1009, 105 S.Ct. 1879, 85 L.Ed.2d 170 (1985) (limitation of defense counsel's use of open-ended questions held proper exercise of court's discretion); 3) misstated the law or the jury's obligation under the law; or 4) asked confusing, irrelevant, or argumentative questions of the panel.

In each instance, the trial court's limitation of appellant's questioning was reasonable, a proper exercise of the court's discretion in controlling voir dire. Counsel questioned the members of the panel extensively on their ability to impose the death penalty and their beliefs regarding the defense of diminished capacity. Contrary to appellant's contention, the trial court did not entirely preclude appellant from following any particular line of questioning. The court properly required appellant, however, to narrow his questioning according to the dictates of existing law. The trial court allowed sufficient latitude in determining whether each venireperson could fairly and impartially follow the court's

instructions during deliberations. *See* § 494.470.2, RSMo 1994 ("Persons whose opinions or beliefs preclude them from following the law as declared by the court in its instructions are ineligible to serve as jurors on that case."). The trial court also permitted appellant to rephrase any objectionable question. The trial court properly exercised its discretion.

■ Appellant maintains that the trial court should have permitted the venire to answer the following questions:

Q: Well, ladies and gentlemen, the judge will also instruct you that whether or not the defendant testifies cannot be considered by you in any way. Is there anyone here who expects or would want the defendant to testify?

. . . .

Q: [To a specific venireperson] Would you expect the defendant to testify?

. . . .

Q: [All of the following were asked to a specific venireperson. In each instance, objections by the state were sustained.]

. . . [D]o you expect the defendant to testify in this case?

Would you want him to?

If he didn't testify, . . . would that raise any questions in your mind?

Would you have a question in your mind if he didn't testify?

Would you consider it one way or the other if he didn't testify?

Would you hold it against the defendant if he didn't testify?

. . . .

Q: Okay . . . . [I]f the defendant didn't testify, and he won't, and the State was close but not beyond a reasonable doubt, would that cause questions in your mind?

. . . .

Q: Now, can you put it out of your mind that the defendant is not going to testify?

Review is for plain error. Rule 29.11(d).

Appellant was not deprived of an opportunity to ask the members of the panel whether they would be able to follow the court's instruction regarding the defendant's right not to testify. The trial court repeatedly directed appellant's counsel to rephrase questions so as to determine whether a venireperson had such strong beliefs about appellant's right not to testify that he or she could not follow the court's instructions on that issue. The other queries, touching upon a prospective juror's expectations or feelings, were irrelevant and properly excluded. The trial court did not plainly err.

■ Appellant contends that the trial court erred in sustaining the state's challenge for cause to venireperson Sartain. The record reflects that venireperson Sartain, when asked by both the state and the appellant about his ability to follow the law and instructions in a capital case, responded with inconsistent answers. Early in the voir dire Sartain indicated that, although "there is some hesitancy, . . . I do believe given the right set of circumstances that I could [vote for the death penalty]." In response to a later question from the state, he acknowledged that he would require "more evidence" to find the defendant guilty in a capital case than in a case in which the death penalty was not involved. Subsequently, he attempted to clarify that statement by stating that, given the nature of punishment in this case, he would "have to be convinced, you know, beyond a shadow of a doubt." Upon questioning by the appellant, however, Sartain said he would not hold the state to a burden of proof beyond a reasonable doubt, only that he would want to be "firmly convinced" that each element was proved beyond a reasonable doubt.

At the request of appellant, and following an initial denial of the state's challenge for cause, Sartain was recalled for further voir dire. At that time, the following exchange occurred between the state and Sartain:

Q: Do you believe you could sign a death verdict if it were your role to do so and return it in open court?

A: No, sir, I don't think I could.

Q: All right. You sound very definite.

A: I'm quite sure of that. That's the way I feel now . . . .

Q: You're saying that you don't think under any circumstances that you could sign a death verdict[?] . . .

A: Yes, sir, that's probably exactly what I'm trying to say. I know you're not trying to put words in my mouth, and I'm trying to explain to you exactly how I feel. But to the best of my knowledge, right now I can say under any circumstances I don't believe I could sign it.

Under appellant's questioning, Sartain stated further: "I don't think that I could sign it in any, in any circumstance." The trial court later sustained the state's challenge for cause to venireperson Sartain.

Appellant contends that the court erred in sustaining the state's motion to strike Sartain for cause because he revealed "no moral, ethical, or religious scruples against the death penalty." *See Adams v. Texas*, 448 U.S. 38, 43, 100 S.Ct. 2521, 2525, 65 L.Ed.2d 581 (1980). He argues that the only ambivalence Sartain demonstrated was on the issue of whether he could serve as foreperson and sign a verdict pronouncing the sentence of death. Because there is no requirement that a prospective juror demonstrate that he is qualified to serve as foreperson in a capital trial, appellant contends that the trial court abused its discretion in striking Sartain for cause and he is entitled to a new penalty phase.

The Sixth and Fourteenth Amendments to the United States Constitution, which guarantee an impartial jury, prohibit the exclusion of venirepersons "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Gray v. Mississippi*, 481 U.S. 648, 657, 107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987) (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 522, 88 S.Ct. 1770, 1777, 20 L.Ed.2d 776 (1968)). Potential jurors who are "irrevocably committed . . . to vote against the death penalty regardless of the facts and circumstances" that may emerge during trial are properly excluded from the panel. *Gray*, 481 U.S. at 657–58, 107 S.Ct. at 2051. There is no requirement, however, that it appear with "unmistakable clarity" that the venireperson will "automatically" vote against the imposi-

tion of capital punishment. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). Instead, the standard for determining when a prospective juror may be excluded for cause because of his or her views on the death penalty is whether those views, culled from the voir dire as a whole, would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Id.* "Venirepersons may properly be excused if their views would preclude following instructions given by the court, including the inability to follow instructions regarding the burden of proof as to the death penalty." *Gray*, 887 S.W.2d at 383; § 494.470.2.

The qualifications of a prospective juror are not determined conclusively by a single response "but are made on the basis of the entire examination." *State v. Brown*, 902 S.W.2d 278, 285 (Mo. banc), *cert. denied*, — U.S. —, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995). Because it is in the best position to evaluate the venireperson's commitment to follow the law, the trial court has broad discretion in determining the qualifications of prospective jurors. Its ruling on a challenge for cause will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion. *McMillin*, 783 S.W.2d at 91.

This Court has previously and repeatedly rejected the claim that asking whether a prospective juror could sign a death verdict if selected as foreperson improperly seeks a commitment from the venireperson. *State v. Chambers*, 891 S.W.2d 93, 102 (Mo. banc 1994); *State v. Parker*, 886 S.W.2d 908, 921 (Mo. banc 1994), *cert. denied*, — U.S. —, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995); *see also, McMillin*, 783 S.W.2d at 91. Ability to assess the death penalty as jury foreperson is a proper basis for follow-up questioning directed to an equivocating venireperson. *See Clemmons v. State*, 785 S.W.2d 524, 529 (Mo. banc), *cert. denied*, 498 U.S. 882, 111 S.Ct. 229, 112 L.Ed.2d 183 (1990). Sartain unequivocally refused to sign a verdict of death. He previously equivocated about his ability to follow the law in a capital case. The trial court

could reasonably have concluded that Sartain's views could at least "substantially impair" his ability to follow the law and perform the duties required of him as a juror. *See Witt*, 469 U.S. at 424, 105 S.Ct. at 852. The trial court did not abuse its discretion by sustaining the state's motion to strike Sartain for cause. The point is denied.

### GUILT PHASE

■ Appellant contends that the trial court erred in overruling his motion to exclude the testimony of Janie Hemphill, the daughter of Louise Hemphill. Janie was seven years old at the time of her mother's murder; she was nine when she testified in the guilt phase of the trial. The substance of the examination was that Louise Hemphill took Janie to school at 8 o'clock on the morning of her death and that Janie never again saw her mother. Appellant did not object to any of the nine questions the state asked Janie. After Janie Hemphill was finally excused, appellant moved to exclude her testimony on the ground that it was irrelevant and served to elicit sympathy from the jury. Stating that one of the jurors was crying during the testimony, appellant moved for a mistrial. The trial court overruled both motions.

■ Appellant alleges that the testimony was "victim impact evidence" improperly introduced during the guilt phase of his trial. He further alleges that the testimony was not logically relevant in that it was not probative of any issue in dispute. *See, e.g., State v. Shurn*, 866 S.W.2d 447, 457 (Mo. banc 1993), *cert. denied* — U.S. —, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). Alternatively, appellant contends that Janie's testimony was not legally relevant in that its prejudicial effect far outweighed its probative value. The testimony, appellant argues, was elicited by the state solely to "evoke sympathy, passion, and prejudice into the proceeding." Because the appellant failed to object and his motion to strike was made after the witness was excused, review is for plain error. *State v. Johnson*, 286 S.W.2d 787, 795 (Mo.1956).

■ The trial court has broad discretion in ruling on the admissibility of evidence where the issue is relevancy. *McMillin*, 783

S.W.2d at 100. Janie Hemphill's testimony was both logically and legally relevant. Janie was one of the last persons to see her mother alive. The jury could reasonably have inferred that appellant saw Louise Hemphill leave Janie at school, thereby learning that Louise would be home alone, a factor the jury could properly consider on the question of deliberation. The fact that Janie was only nine years old could certainly evoke the jurors' sympathy but does not constitute, in and of itself, reason to exclude her testimony. Any incriminating evidence offered against the defendant is prejudicial. The trial court did not abuse its discretion in its finding that the logical relevance of the evidence outweighed its prejudicial effect.

Appellant additionally argues that the trial court erred in failing to sustain his motion for a mistrial following Janie's testimony. Since the trial court did not err in admitting Janie's testimony, it did not err in overruling appellant's motion for mistrial.

■ Appellant contends that the trial court erred in sustaining the state's objection to the admission of three defense exhibits during the guilt phase. Each contains numerous documents relating to investigations into appellant's childhood, as well as his medical, psychological, and sociological background. The exhibits include court reports and orders, medical and psychological reports from various institutions and treatment facilities, progress reports compiled by employees of the Missouri Division of Family Services (DFS), and transcribed interviews with appellant's family conducted by DFS employees. In addition, the exhibits contain interviews, medical records, and DFS investigatory reports of and relating to appellant's siblings and adoptive parents. Included within the exhibits is the "Paul Kreutzer Case Study," a report written by Ronald Stanislaus, a DFS official in Pike County.

Appellant called Stanislaus to testify, seeking to adduce testimony regarding the DFS case study and the investigation upon which it was based. Appellant also sought to introduce into evidence the exhibits themselves. The disputed exhibits contain numerous documents and reports concerning a DFS inves-

tigation that began more than six years prior to trial. In preparing his case study, Stanislaus apparently relied on all three exhibits, which combine the notes, reports, correspondence, and observations of a host of individuals, all of whom contributed in some manner to the final evaluation of appellant. At trial, appellant argued that Stanislaus, in his capacity at DFS, read all the documents and considered them necessary to the division's determination and recommendation of appellant's final placement. Appellant contends that the trial court should have admitted each of the exhibits as a whole as a business record. Review is for abuse of discretion. *State v. Williams*, 797 S.W.2d 734, 739 (Mo. App.1990).

■ The Uniform Business Records as Evidence Law is a statutory exception to the hearsay rule. Sections 490.660—.690, RSMo 1994. The exception was enacted in an effort to abrogate many of the antiquated and technical common law rules governing the admission of records into evidence. *Rossomanno v. Laclede Cab Co.*, 328 S.W.2d 677, 681 (Mo. banc 1959). The law acknowledges that records made and relied upon in the regular course of business may be regarded as trustworthy without the verification from all parties who contributed to their compilation. *Id.* The exception, however, will not act to make admissible any evidence within the record that would be incompetent if offered by the individual who initially recorded the information. *Ryan v. Campbell "66" Express*, 304 S.W.2d 825, 828 (Mo. banc 1957); *State v. Jordan*, 664 S.W.2d 668, 672 (Mo.App.1984). "If the content of the record could not have been testified to by the reporter had he been offered as a witness present in court, then that content will not be admitted into evidence as part of a business record." *State v. Vance*, 633 S.W.2d 442, 444 (Mo.App.1982). Before any item in such a record may be admitted into evidence under the act, "the report must be shown to be either based on the entrant's observations or on the information of others with a business duty to transmit it to the entrant." *Jordan*, 664 S.W.2d at 672.

The trial court correctly applied the business records exception. The majority of the documents upon which Stanislaus relied were the reports of other persons. Many of the documents were rife with hearsay statements, inadmissible even if the various authors of the documents had testified, because they were based upon information gathered from others who did not have a business duty to transmit it to the entrant. *See Jordan*, 664 S.W.2d at 672. The court properly ruled that if appellant laid a proper foundation, Stanislaus could testify about his own interactions with appellant and about the documents of which Stanislaus had personal knowledge, as well as those documents that would be admissible if offered by the individual who initially recorded the information. The trial court did not err in excluding testimony that would have reported inadmissible hearsay.

■ During the guilt phase, the state offered several items of evidence connected with the arrest of appellant and the seizure of his automobile. Among the items recovered from the car was a BB gun that officers found on the rear floorboard directly behind the passenger seat of the vehicle. A photograph of the rear passenger portion of the car, containing a partial view of the gun, was admitted into evidence without objection. The state later offered exhibit 65, a photographic close-up of the gun. The trial court admitted exhibit 65 over appellant's relevance objection. Subsequently, the state offered the BB gun itself into evidence as exhibit 66. The gun was introduced into evidence along with other items found in the automobile, including appellant's bloodstained gloves, duct tape similar to that used to bind the victim, and the victim's billfold. The BB gun was admitted into evidence without objection. Almost immediately afterwards, however, counsel objected, stating that he had "inadvertently" failed to realize that the gun was being offered into evidence. The court overruled the objection.

Appellant alleges that the trial court erred in overruling his objections to the admission of exhibits 65 and 66 because they concern a weapon not connected to the crime with which appellant is charged and they constitute an improper attempt to inflame the jury. Because appellant affirmatively stated that

he did not object to the introduction of the gun into evidence, the state seeks plain error review.

The general rule is that physical evidence is admissible if it is relevant to a material matter at issue. *State v. Griffin,* 756 S.W.2d 475, 482 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). Appellant relies on *State v. Perry,* 689 S.W.2d 123, 124 (Mo. App.1985), where a 20–gauge shotgun was found after a high speed chase of the defendant's mother's car in which defendant was a passenger. The court of appeals ruled the shotgun inadmissible where the robbery weapon was a handgun and there was no evidence that defendant owned the shotgun or knew of its presence in the vehicle. *Id.* at 126. Appellant also relies, *inter alia,* upon *State. v. Reyes,* 740 S.W.2d 257, 260 (Mo.App.1987), which involved a hunting knife located under the front seat of an automobile in which the defendant was a back seat passenger. There the knife was inadmissible where the victim was killed by a shotgun blast and there was no evidence that defendant had possessed the knife and no evidence otherwise to connect the knife to the defendant or the crime. *Id.* at 265.

Appellant relies on cases that are factually distinguishable. First, appellant completely disregards the fact that he is directly connected to the BB gun. In fact, appellant does not contest that he purchased the BB gun at a store in Louisiana, Missouri, at 9:41 a.m. on the morning of the murder, not long after appellant had been seen in the vicinity of the school to which the victim had driven her daughter. Further, at the time of appellant's arrest, officers found the BB gun in the back seat of appellant's automobile together with the items appellant had apparently either used in commission of the crime or appropriated from the victim during or after the crime.

■ Second, appellant disregards the relevance of the BB gun. It is well settled that weapons are admissible in evidence even if they are not used in the crime, so long as they relate to the crime with which the defendant is charged. *State v. Scott,* 858 S.W.2d 282, 285 (Mo.App.1993); *see also*

*Griffin,* 756 S.W.2d at 482–83. Although, as the state acknowledged to the trial court, there is no direct evidence that appellant used the BB gun in the course of his crime, the evidence permits an inference that appellant may have employed the gun to gain entrance into the victim's home and to take control of the victim. Appellant purchased the BB gun less than two hours before the murder allegedly occurred; and the gun resembled a hand gun such that police officers believed it was real until they more closely inspected it. The gun was discovered together with other items related to the crime.

The existence of the BB gun is also relevant for the reason that it would serve to establish the probability of another fact in controversy, that being whether appellant bought the pistol for the purpose of using it in his contemplated crime. The reasonable inference from this fact goes to appellant's theory of defense, that he was incapable of acting with cool reflection in murdering the victim. Finally, as the trial court noted, the gun was relevant because the time of its purchase identified appellant's location a relatively short time before the murder was committed, tending to establish appellant's guilt, as well as the untruthfulness of statements he made to police about his whereabouts on the morning of the murder. The trial court did not abuse its discretion in admitting into evidence either the photograph of the BB gun or the gun itself.

■ In a related claim, appellant asserts that his counsel was ineffective and that he was prejudiced because counsel failed to make a timely objection to the BB gun. Counsel cannot be deemed ineffective for failing to make a non-meritorious objection, nor is counsel ineffective in failing to preserve non-meritorious points for review. *Six,* 805 S.W.2d at 171.

Early in the proceedings against him, appellant gave written notice of his intention to rely on the defense of not guilty by reason of mental disease or defect excluding responsibility. Section 552.030.2, RSMo 1986. The trial court sustained appellant's motion for the appointment of a court ordered psychiatric evaluation and ordered an examination

under the provisions of sections 552.020 and 552.030. Appellant never entered a plea of not guilty by reason of mental disease or defect. At trial he claimed, however, that because of his diminished capacity he lacked the mental state necessary to deliberate; therefore, he argued, he could not be found guilty of murder in the first degree. *See* § 552.015.2(8), RSMo 1986 ("Evidence that the defendant did or did not suffer from a mental disease or defect shall be admissible in a criminal proceeding to prove that the defendant did or did not have a state of mind which is an element of the offense."); *State v. Anderson*, 515 S.W.2d 534, 539–40 (Mo. banc 1974) (recognizing the statutory defense of partial responsibility or diminished capacity). Three experts testified on the issue of diminished capacity at trial, two on behalf of appellant and one on behalf of the state.

Appellant objected to the court's submission of Instruction No. 8:

> You will recall that certain doctors testified to statements that they said were made to them and information that they said had been received by them during or in connection with their inquiry into the mental condition of the defendant.
>
> In that connection, the Court instructs you that under no circumstances should you consider that testimony as evidence that the defendant did or did not commit the acts charged against him.

Instruction No. 8 followed the approved pattern instruction MAI–CR3d 306.04. Appellant alleges that the trial court erred because the instruction directed the jury that "under no circumstances" could it consider expert testimony supporting appellant's defense of diminished capacity.

Appellant's argument disregards the law and the fact that Instruction No. 8 correctly stated it. Missouri law provides for two species of pretrial, court ordered psychiatric examinations. Section 552.020.2, RSMo 1986, authorizes a determination of the mental fitness of the accused to stand trial. Section 552.030.3, RSMo 1986, authorizes a determination of the availability to the accused of the defense of not guilty by reason of mental disease or defect, which acts to excuse responsibility for the acts charged.

Section 552.030.1, RSMo 1986. Section 552.030.5, RSMo 1986, then provides:

> No statement made by the accused in the course of [a 552.030] examination and no information received by any physician or other person in the course thereof ... shall be admitted in evidence against the accused on the issue of whether he committed the act charged against him in any criminal proceeding.... The statement or information shall be admissible in evidence for or against him only on the issue of his mental condition, whether or not it would otherwise be deemed to be a privileged communication.

Subsection five is designed to protect a criminal defendant from a finding by the jury that he committed the acts charged against him as a result of statements made by him or information obtained by the examiner during the course of the accused's examination. *State v. Speedy*, 543 S.W.2d 251, 256–57 (Mo. App.1976). If any statement or information obtained from the section 552.030 examination is admitted, the trial court must, orally at the time of its admission, and, later, by instruction, inform the jury that it must not consider the statement or information as evidence of whether the accused committed the act charged against him. Section 552.030.5. Instruction No. 8 followed the provisions of section 552.030.5.

Appellant nevertheless contends that Instruction No. 8 is contrary to law and is inapplicable in diminished capacity defense cases such as his because it "erroneously instructed that [the jury] could not consider in its determination of guilt or innocence valuable evidence that went toward [appellant's] diminished capacity defense ...," which necessarily attacks only the specific intent necessary for conviction of the crime charged. *Anderson*, 515 S.W.2d at 539–40. Although appellant never seriously contested that his actions resulted in the death of the victim, the state was burdened to prove beyond a reasonable doubt that defendant "knowingly cause[d] the death of another person after deliberation upon the matter." Section 565.020.1, RSMo 1986. The verdict director on the charge of murder in the first degree required the jury to find "delibera-

tion, which means cool reflection upon the matter. . . ." *See* MAI–CR3d 313.02. Appellant contends that Instruction No. 8 improperly directed the jury not to consider diminished capacity evidence in the determination of his guilt. For clarity, this Court more fully explicates appellant's contention: Because the instruction specifically excludes the doctors' testimony from the jury's consideration of whether appellant committed the acts charged against him, the instruction prohibits the jury from considering the evidence on the issue of the mental states required by the murder verdict directors. Because appellant contested criminal liability solely on the defense of diminished capacity, the jury might have believed that it could not consider to any extent the doctors' testimony in determining whether appellant was guilty of murder in the first or second degree.

Appellant's contention itself confuses the issue. The "acts" to which the limiting instruction refers are only those actions that culminated in the death of Louise Hemphill. Instruction No. 8 does not, as appellant asserts, direct the jury "that [it] could not consider in its determination of guilt or innocence" testimony proffered by the doctors on the subject of appellant's mental condition. To the contrary, the instruction emphasizes to the jury that it must consider such testimony only in its determination of whether appellant had the *mens rea* necessary to be guilty of murder in the first degree.

The error of appellant's contention that the jury would have been misled by Instruction No. 8 is further emphasized by reading, as the jury would have read, the two immediately preceding instructions. Instruction No. 6, appellant's converse to the state's first degree murder verdict director, highlighted the necessity of a finding of deliberation beyond a reasonable doubt:

> If you have a reasonable doubt as to whether defendant caused the death of Louise Hemphill after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, you must find the defendant not guilty of murder in the first degree as submitted in Instruction No. 5.

Instruction No. 7 specifically directed the jury to consider evidence that appellant "had or did not have a mental disease or defect in determining whether [he] had the state of mind required to be guilty of murder in the first degree." MAI–CR3d 8.03. Instruction No. 7 defined the term "mental disease or defect" and instructed:

> If, after considering all of the evidence, including evidence that the defendant did or did not have a mental disease or defect, you have a reasonable doubt as to whether defendant caused the death of Louise Hemphill after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, you must find the defendant not guilty of murder in the first degree as submitted in Instruction No. 5.

Instruction No. 8 then follows, admonishing the jury it may not, under any circumstances, consider the doctors' testimony as evidence that the defendant "did or did not commit the acts charged against him."

Instruction No. 8 is a correct statement of the law. It cannot be said to have confused or misled the jury. The instruction was a proper limitation on the jury's deliberation.

Appellant relies on *State v. Strubberg,* 616 S.W.2d 809, 816 (Mo. banc 1981). The case is readily distinguishable. Strubberg did not plead not guilty by reason of mental disease or defect, nor did he give notice of his intention to rely on the defense as required by section 552.030.2, RSMo 1969. Strubberg was granted a court ordered psychiatric examination solely to determine his fitness to stand trial under section 552.020.2, RSMo Supp.1975. *Id.* at 812. At trial Strubberg used evidence obtained in his section 552.020 examination in an attempt to prove his diminished capacity at the time of the offense. *Id.* On appeal, Strubberg argued that he was entitled to MAI–CR 2.36, the predecessor to MAI–CR3d 306.04, which would have instructed the jury that the testimony offered with regard to his section 552.020 examination was to be considered solely on the issue of the mental condition of the defendant at the time of the offense charged against him and not as evidence that defendant did or did not commit the acts charged against

him as required by section 552.030.6, RSMo 1969. *Id.*

In affirming the trial court's decision not to give the proffered instruction in *Strubberg,* this Court differentiated between a section 552.020 examination and a section 552.030 examination. Although an accused may properly introduce evidence obtained in the section 552.020 examination to establish his diminished capacity defense, this Court held that the oral and written limiting instructions mandated by section 552.030 are directed only to statements and information "obtained in the course of any court ordered .030 type examination after entry of a plea of not guilty by reason of mental disease or defect" or a notice of intention to do so. *Strubberg,* 616 S.W.2d at 816–17. Because the appellant in *Strubberg* did not seek or receive an examination pursuant to section 552.030, nor could his examination under section 552.020 be treated by the court as a section 552.030 examination, he was not entitled to the limiting instruction. *Id.*

*Strubberg* is of no assistance to appellant. Appellant filed timely notice of his intention to plead not guilty by reason of mental disease or defect. Section 552.030.2. The trial court properly ordered a mental examination pursuant to section 552.030. The trial court did not err in giving the required instruction.

Appellant asserts that the trial court erred in submitting to the jury Instruction No. 4, which defined proof beyond a reasonable doubt. The challenged instruction read in part: "Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt." MAI–CR3d 302.04. Appellant argues that the instruction diminishes the required quantum of proof in a criminal trial and allows for a conviction based upon a lesser standard of proof than that mandated by due process. This Court has repeatedly rejected this claim. *Chambers,* 891 S.W.2d at 105; *State v. Harris,* 870 S.W.2d 798, 811 (Mo. banc), *cert. denied,* — U.S. —, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994); *State v. Brown,* 902 S.W.2d 278, 287 (Mo. banc), *cert. denied,* — U.S. —, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995). The point is denied.

Appellant seeks plain error review of the trial court's failure *sua sponte* to declare a mistrial after the prosecutor challenged appellant's theory of defense and made reference to the victim's reputation during the opening statement of the guilt phase. The prosecutor stated:

And you know what else we know? We know because he is the one in, the one out of 150,000 who could have put that semen on that cover and on those sweat pants. So we know it's him [sic]. *And the defense knows we know it's him* [sic]. *That's why we've come up with the defense that we have . . . .*

Now, I suggest to you that finding the defendant guilty of anything other than murder in the first degree is an insult to [the victim's] reputation. (Emphasis added)

Appellant claims the state denigrated defense counsel and implied that counsel was suborning perjury.

Appellant's claim is without basis. The prosecutor may comment on the evidence and the credibility of the defendant's case. Counsel may even belittle and point to the improbability and untruthfulness of specific evidence. *See State v. Weaver,* 912 S.W.2d 499, 513–14 (Mo. banc 1995); *see also State v. Ward,* 807 S.W.2d 225, 226 (Mo.App. 1991). The argument here suggested that appellant offered a defense of diminished capacity because the evidence of guilt was overwhelming. The comment was permissible. *See Ward,* 807 S.W.2d at 226; contrast *State v. Greene,* 820 S.W.2d 345, 346–47 (Mo. App.1991); *State v. Burnfin,* 771 S.W.2d 908, 912–13 (Mo.App.1989); *State v. Harris,* 662 S.W.2d 276, 276–77 (Mo.App.1983).

Appellant contends that the prosecutor's reference to the victim's reputation constituted improper personalization to the jury. *See State v. Storey,* 901 S.W.2d 886, 901 (Mo. banc 1995). Appellant's characterization is incorrect. The prosecutor did not suggest personal danger to the jurors or their families. *See Shurn,* 866 S.W.2d at 464. Considered in context, the prosecutor commented on the importance of enforcing the law and contended that, in the state's view, the evidence showed that appellant was guilty of

first degree murder so that any other verdict would be an injustice to the victim. *See State v. Debler*, 856 S.W.2d 641, 651 (Mo. banc 1993); *State v. Mease*, 842 S.W.2d 98, 110 (Mo. banc 1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993).

 Again citing *Storey*, 901 S.W.2d at 901–02, appellant contends that the trial court plainly erred in failing *sua sponte* to declare a mistrial after several remarks made by the prosecutor during closing argument in the guilt phase. Appellant contends that the prosecutor improperly insinuated personal knowledge of facts not in evidence when he made the following argument:

Can you all turn and look at that clock for me? Can you all see it? I want you to watch that clock, and I want you, if you would, to squeeze your hand just enough so you can feel it, and I want you to watch that clock when that second hand gets up to 12 and we'll watch it for one minute. Starting right now.

That's one minute.

In order to kill her, he had to keep that constant pressure for three to five times that long. *I've never seen anybody who could get into a rage and not realize when the person is not resisting, and they keep doing something like that.* I mean, they don't, you don't kill that quick. . . .

So he had to do that that long. He knew what he was doing, if at no other time he realized he was doing, while he had that thing around her throat. (Emphasis added.)

*Storey* is of no assistance to appellant. A prosecutor is entitled to argue matters supported by the evidence or matters reasonably inferable from the record. *Mease*, 842 S.W.2d at 110. Considered in context, the prosecutor's comment in the present case stated a reasonable inference that appellant's theory of defense was not believable. There is no error, plain or otherwise.

 Appellant complains of the following argument made at the conclusion of the prosecutor's guilt-phase closing:

PROSECUTOR: One thing I see over and over again is every excuse in the world for somebody committing some kind of crime. And you know, I kind of get a little tired of it, and I think I've heard most of them. People tell you they're too poor or they're too rich or they're too white or they're too black or they're too socially economic, socioeconomically deprived or their mother didn't breast-feed them as a child or—on and on and on and on and on. Or I'm too crazy or I'm not crazy enough. I've heard it all.

DEFENSE COUNSEL: Objection to what he's heard, Your Honor.

THE COURT: Objection will be sustained.

PROSECUTOR: What I want you to do, you don't have to explain to anybody what you decide, but what I want you to do before you return any verdict other than murder in the first degree is in your heart you explain it to her.

Appellant contends that the prosecutor's statement that appellant's defense was just one of the many excuses he had heard argued facts not in evidence. *See Storey*, 901 S.W.2d at 901. Defense counsel objected and the trial court sustained the objection. The trial court granted the relief sought. Appellant did not request a mistrial. Gratuitous review reveals no plain error. *See State v. White*, 782 S.W.2d 461, 465 (Mo.App.1990). The trial court did not plainly err in failing *sua sponte* to declare a mistrial.

Appellant further contends that the prosecutor's comment that the jury should explain to the victim any verdict other than murder in the first degree constituted improper personalization to the jury and inflamed the jury. *See Storey*, 901 S.W.2d at 901. Appellant is incorrect. The comment is similar to the reference to the victim's reputation made in the prosecutor's opening statement; it is not comparable to the argument in *Storey* in which the prosecutor inflamed the passions of the jury and played upon its fears. There is no plain error.

Finally, the challenged argument does not compare to the "egregious errors, each compounding the other" found in *Storey*, 901 S.W.2d at 902. None of the prosecutor's comments, viewed individually or cumulative-

ly, was reversible error. Appellant's challenge to the guilt-phase argument is denied.

Appellant attempts to raise a related claim that counsel was ineffective for failing to object to certain portions of the prosecutor's guilt-phase argument or preserve a challenge to the argument in the motion for a new trial. The claim is waived, not having been raised in appellant's pro se or amended Rule 29.15 motions. *See State v. Ervin,* 835 S.W.2d 905, 929 (Mo. banc 1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993).

## PENALTY PHASE

Appellant contends that the trial court plainly erred when it allowed the state to present evidence in the penalty phase regarding two separate incidents that allegedly occurred fewer than ten days before the murder of Louise Hemphill. Appellant allegedly harassed and exposed himself to Gay Lynn Hipes and to Patricia Burns, each of whom contacted police. Appellant was arrested and charged with indecent exposure in connection with the incident involving Burns.

There is no plain error. The trial court has discretion during the penalty phase of trial to admit whatever evidence it deems helpful to the jury in assessing punishment, including evidence regarding the character of the defendant. *Six,* 805 S.W.2d at 166–67. The importance of the death penalty decision entitles the sentencer to any evidence that may assist it in making that decision. *Chambers,* 891 S.W.2d at 107. Both incidents evidenced appellant's character; they are, therefore, admissible. *See id.*

Appellant relies on *Debler,* 856 S.W.2d at 656–57, which held that extensive evidence of serious unconvicted crimes is inadmissible where the state provides no timely notice that it intends to introduce the evidence. *Debler* is of no assistance to appellant. The state notified appellant of its intent to introduce the testimony of Hipes and Burns before trial. This Court made clear in *Cham-*

bers, 891 S.W.2d at 107, that the error in *Debler* was the lack of notice.[1] Furthermore, appellant himself had called a law enforcement officer in the guilt phase of the trial to testify about both incidents. Appellant was well aware, therefore, that evidence of the incidents would be admitted, and used the incidents in support of appellant's diminished capacity defense in the guilt phase, and in purported mitigation of punishment in the penalty phase. *Debler* is of no assistance to appellant.

Appellant contends that the evidence of unconvicted acts was inadmissible because the jury was not instructed to find that he committed the acts beyond a reasonable doubt. *See Debler,* 856 S.W.2d at 657. Appellant's argument is without merit. *Debler* stated that the jury must unanimously find beyond a reasonable doubt the defendant's commission of a specific unconvicted act *if* it is instructed as a nonstatutory aggravating circumstance. *Id.* The unconvicted acts at issue in the present case were not submitted as nonstatutory aggravating circumstances. The jury was not specifically instructed on the acts. There is no plain error.

In a directly related point, appellant contends that the postconviction motion court clearly erred in denying his Rule 29.15 claim that counsel was ineffective for failure to object to the testimony of Hipes and Burns, and for failing to object to the absence of an instruction on the incidents as nonstatutory aggravating circumstances. To show that counsel's assistance was so defective as to require reversal of a conviction or death sentence, the movant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Appellant fails to meet his burden of proof of ineffective assistance of counsel under the *Strickland* standard. Appellant offered no evidence at the postconviction evidentiary hearing as to

---

1. MAI–CR 3d 313.41A (1994), which applies to homicides committed on or after August 28, 1993, reflects an amendment to section 565.032.1(2), RSMo Supp.1993. The amended statute provides that "[i]f the trier is a jury, it shall not be instructed upon any specific evi-

dence which may be in aggravation or mitigation of punishment, but shall be instructed that each juror shall consider any evidence which he considers to be aggravating or mitigating." *See* MAI–CR 3d 313.41A (1994), Note on Use 4.

why counsel failed to object. *See State v. Tokar*, 918 S.W.2d 753, 768 (Mo. banc 1996). Appellant fails to demonstrate that counsel's failure to object was not valid trial strategy. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Defense counsel cross-examined Hipes and Burns and presented independent evidence regarding the incidents in support of appellant's case in both the guilt and punishment phases of the trial. The point is denied.

■ Appellant claims that the prosecutor made several improper comments during closing argument of the penalty phase of the trial. Appellant first contends that the trial court erred in overruling his objection after the prosecutor stated that "[the victim's] rights were not considered in the least." Defense counsel made the following argument during his penalty-phase closing:

And I'm not asking you to do something nice for Paul Kreutzer. I'm asking you to look at the motivations that everybody has for doing what they're asking you to do. I'll remind you of the look of anger that Lynn Hipes saw on [the defendant's] face. Don't do what [the defendant] did in anger. Don't, because you are so angry at him, become like him.

I understand that the State would feel like they have failed in their duty to protect both him and her, but don't become so angry that you kill him because you don't like the way the world is.

In rebuttal, the prosecutor argued:

You know, I am always amazed at the argument that the defense has when they want to make you feel like voting for the death penalty would make you just like a killer. I'm amazed at it because you have seen the great pains that have been taken to ensure that every possible right has been guaranteed the defendant, and that if it was necessary to protect society to take his life by a sentence of death, that was done by 12 people having to agree, and only after all of his rights are scrupulously observed.

***Well, [the victim's] rights were not considered in the least* . . . .**

There is no comparison between voting for a death penalty and without any excuse bludgeoning and choking the mother of three to death. Don't let them fool you into thinking that by voting for death you're no better than he is. That just isn't so. (Emphasis added)

Appellant claims that the prosecutor's comment improperly implied "that the system coddles criminals by providing them with more procedural protections than their victims." *See Brooks v. Kemp*, 762 F.2d 1383, 1411 (11th Cir.1985) (further citation omitted).

■ Appellant offered no ground for his objection to the prosecutor's argument at trial. The point was not raised in appellant's motion for a new trial. Plain error review mandates reversal only if the error results in manifest injustice, and only if the argument had a decisive effect on the jury. *Shurn*, 866 S.W.2d at 460.

■ Considered in context, the prosecutor's argument was proper retaliation for defense counsel's closing argument. A defendant may not provoke reply to his own argument and then assert error. *Parker*, 886 S.W.2d at 922. The prosecutor merely responded to defense counsel's assertion that the jury would be "like" appellant if it sentenced him to death. There is no error, plain or otherwise.

■ Appellant next contends that the trial court erred in overruling his objection to the following argument by the prosecutor:

Life without parole is not enough. Here is why, at least one reason why. There are other people in those prisons who are trying to pay their debts to society and get out and go home. . . . There are people who work in those places who go home to their families every night. Those people have a right to be able to be safe too. So there are still risks. Don't believe that just because the defendant goes to prison that that is enough to protect us.

Appellant's claim is without merit. The prosecutor's argument was proper retaliation for defense counsel's repeated argument that a sentence of life imprisonment without the

possibility of parole would "protect society." *See Parker*, 886 S.W.2d at 922.

■ Appellant seeks review of the trial court's failure, *sua sponte*, to prohibit the prosecutor from making the following argument:

> Well, society as a whole has the same right to self-defense as [the victim] had. We have the right to stop the predators among us. We have the right to make sure that those predators do not have the opportunity to kill again.

Appellant claims that the argument is indistinguishable from that in *Storey*, 901 S.W.2d at 901–02, in which the prosecutor argued:

> I want you to think about that guy right there on the front row, [the victim's brother]. What if he had happened onto this brutal thing and seen his very close sister in the process of [being] murdered? Would he have been justified in taking the Defendant's life? Yes. Without question. Without question.

Contrary to appellant's assertion, the challenged argument in the present case was not improper personalization because it did not suggest personal danger to the jurors or their families. *See Storey*, 901 S.W.2d at 901; *Shurn*, 866 S.W.2d at 464. The challenged argument in the present case is not comparable to the argument found erroneous in *Storey*. Rather, the argument under scrutiny here is more similar to the penalty-phase argument upheld by this Court in *Shurn*, 866 S.W.2d at 464, in which the prosecutor made reference to a circumstance, such as sentencing a defendant to death, in which it is legal to take a human life. There is no plain error.

In a directly related point, appellant claims that the postconviction court clearly erred in denying his Rule 29.15 motion alleging ineffective assistance for counsel's failure to object to the prosecutor's penalty-phase closing argument regarding societal self-defense. Counsel cannot be deemed ineffective for declining to make non-meritorious objections. *Six*, 805 S.W.2d at 167.

■ Appellant also challenges the following argument by the prosecutor:

> Ladies and gentlemen, I do this sort of thing for a living, and I hope that my naked corpse is never the subject of a photo display. This man not only murdered [the victim] and degraded her, he continues to do it to this very instant.

Appellant claims that the argument was improper for the reason that the prosecutor urged that greater punishment should be imposed because appellant exercised his constitutional right to a jury trial. *See Brooks*, 762 F.2d at 1411. Appellant further contends that the prosecutor's comment that he hoped his naked corpse was never the subject of a photo display was improper because it had no bearing on the jury's sentencing decision. *See Storey*, 901 S.W.2d at 901. Appellant's general objection to the argument preserved nothing for appeal; review is for plain error. *State v. Bell*, 743 S.W.2d 907, 909 (Mo.App.1988); Rule 30.20.

Contrary to appellant's assertion, the prosecutor's argument did not equate appellant's right to a jury trial with the degradation of the victim; rather, it referred to the prosecutor's guilt-phase argument that "finding [appellant] guilty of anything other than murder in the first degree is . . . . an insult when you consider how [the victim] was degraded, how she was butchered, and how all that's left in the memories of her family is a picture of her naked corpse in her child's room." As for the prosecutor's penalty-phase comment regarding the victim's naked corpse, it was irrelevant but does not warrant reversal. The challenged argument simply is not comparable to the prosecutor's repeated injection of personal opinion found erroneous in *Storey*, 901 S.W.2d at 901.

## POSTCONVICTION RELIEF

■ Appellant alleges several instances of ineffective assistance of counsel. To show that counsel's assistance was so defective as to require reversal of a conviction or death sentence, the movant must show that counsel's performance was deficient and that the deficiency prejudiced the defense. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064. In order to prevail on a claim of ineffective assistance of counsel, the movant must satisfy both the performance prong and the prej-

udice prong; if the movant fails to satisfy either prong, the reviewing court need not consider the other. *Sidebottom v. State,* 781 S.W.2d 791, 796 (Mo. banc 1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). Counsel is strongly presumed to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2065–66. The movant must also overcome the presumption that the challenged action was sound trial strategy. *Id.* at 689, 104 S.Ct. at 2065. To show prejudice, the movant must show a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. The movant has the burden of proving grounds for relief by a preponderance of the evidence. Rule 29.15(i).

▪ Appellant contends that counsel failed fully to investigate and present mitigating evidence regarding abuse he suffered while in the custody of his birth parents. Appellant claims that counsel was ineffective for failing to obtain and present at trial his adoption and social service records explaining the circumstances surrounding his removal from the home of his natural parents and the extent of the abuse he suffered as a young child.

The record supports the motion court's finding that counsel performed reasonably in attempting to obtain the records. Counsel attempted to obtain the records from the state of Arkansas before the trial and worked with an Arkansas attorney who filed a petition requesting the release of the records. As a result of her efforts, counsel received a partial transcript of appellant's records, the contents of which were cited by defense experts at trial. The remainder of the Arkansas records were not obtained until well after the conclusion of the trial.

Appellant contends the motion court's finding that the adoption records were not available at the time of trial was "particularly erroneous." Appellant asserts that the records were available at the time of trial; he claims that counsel was ineffective because she did not discover the proper procedure to obtain them. Since the motion court's primary finding that counsel's efforts in obtaining the reports were reasonable was not clearly erroneous, appellant's assertion must fail. *See* Rule 29.15(k). Further, appellant's claim of ineffectiveness is improperly based on hindsight. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Counsel made reasonable efforts to obtain the records and adduced extensive evidence regarding appellant's childhood. *See id.*

▪ Appellant further contends that counsel should have presented the records to the defense experts who testified at trial. He points to the fact that a psychiatrist who reviewed the records testified at the evidentiary hearing that the records were "important" in making a proper diagnosis. Appellant disregards the fact that counsel presented testimony at trial from two experts who referred to abuse by appellant's natural parents in diagnosing appellant's mental state. The additional information contained in the reports and considered by the evidentiary hearing expert would not have altered the outcome of the trial. *See id.* at 694, 104 S.Ct. at 2068.

▪ Appellant also claims that counsel was ineffective for failing to present additional mitigation witnesses. Appellant's claim is not supportable. The selection of witnesses is a virtually unchallengeable question of trial strategy. *Harris,* 870 S.W.2d at 816–17. Counsel's strategy was to argue that appellant was not responsible for the murder of Louise Hemphill because of his mental condition. Counsel obtained two psychological evaluations; two expert witnesses presented findings favorable to appellant. Appellant's theories of defense and mitigation were fully presented to the jury without the additional evidence. The proposed witnesses who testified at the evidentiary hearing offered conclusions and diagnoses similar to those presented by the two defense experts at trial. The motion court's rejection of appellant's claim was not clearly erroneous.

▪ Appellant contends that counsel was ineffective for failing to object to victim impact testimony in the penalty phase of the

trial. The victim's husband and two of her children testified about their relationship with the victim before her death and the effect of her death on the family. Appellant concedes that victim impact evidence is admissible in Missouri. *Parker*, 886 S.W.2d at 926–27. Appellant claims, however, that counsel should have objected because the evidence presented at trial exceeded the bounds of "proper" victim impact evidence under *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991).

■■■■ Appellant's contention is meritless. Victim impact evidence violates the constitution only if it is so "unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 825, 111 S.Ct. at 2608. *Payne* expressly permits evidence "relating to the victim and the impact of the victim's death on the victim's family." *Id.* at 830 n. 2, 111 S.Ct. at 2611 n. 2. The victim impact evidence presented at trial was clearly admissible under *Payne*; objection to the evidence would have been futile. Counsel cannot be deemed ineffective for declining to make a non-meritorious objection. *Six*, 805 S.W.2d at 167. Appellant's related contention that the victim impact evidence was a nonstatutory aggravating circumstance that should have been specifically listed in the penalty-phase instructions is waived because it was not included in his original or amended Rule 29.15 motion. *See Ervin*, 835 S.W.2d at 929.

### INDEPENDENT REVIEW

Under section 565.035.3(1), (2), and (3), RSMo 1994, this Court is obligated to determine: (1) whether the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether the statutory aggravating circumstances and any other circumstances found by the trial court were supported by the evidence; and (3) whether the sentence is excessive or disproportionate to the punishment imposed in similar cases, considering the crime, the strength of the evidence, and the defendant.

■■■■ There is no evidence in the record to suggest that the punishment recommended by the jury and imposed by the trial court was imposed under the influence of passion, prejudice, or any other arbitrary factor.

The jury found the following statutory aggravating circumstances in assessing the verdict of death: that the murder of Louise Hemphill was committed while appellant was engaged in the perpetration of the felony of burglary, section 565.032.2(11); and that the murder was committed for the purpose of receiving money or any other thing of monetary value for himself, section 565.032.2(4). In addition, the jury found the nonstatutory aggravating circumstance of appellant's four prior criminal convictions on three counts of burglary and one count of conspiracy. *See* § 565.032.1(3), RSMo 1986. The evidence supported submissions and findings on all of the aggravating circumstances.

■■■ Proportionality review serves the purpose of assuring that imposition of the death sentence is not "freakish or wanton" under the facts of the case. *State v. Ramsey*, 864 S.W.2d 320, 328 (Mo. banc 1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1664, 128 L.Ed.2d 380 (1994). Only when the case "taken as a whole, is plainly lacking circumstances consistent with those in similar cases in which the death penalty has been imposed" will resentencing be ordered. *Id.* This Court has compared Missouri cases in which the death penalty was imposed on defendants who committed murder in the first degree while engaged in the perpetration or attempted perpetration of a burglary in the victim's home. *Ramsey*, 864 S.W.2d 320; *Griffin*, 756 S.W.2d 475; *State v. Schneider*, 736 S.W.2d 392 (Mo. banc 1987), *cert. denied,* 484 U.S. 1047, 108 S.Ct. 786, 98 L.Ed.2d 871 (1988). In other cases, the death penalty has been imposed on defendants who committed murder for the purpose of receiving money or any other thing of monetary value from the victim or victims. *Tokar*, 918 S.W.2d 753; *State v. Wise*, 879 S.W.2d 494 (Mo. banc 1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 757, 130 L.Ed.2d 656 (1995); *Ramsey*, 864 S.W.2d 320; *State v. Hunter*, 840 S.W.2d 850 (Mo. banc 1992), *cert. denied,* 509 U.S. 926, 113 S.Ct. 3047, 125 L.Ed.2d 732 (1993); *State v. Ervin*, 835 S.W.2d 905 (Mo. banc 1992), *cert. denied,* 507 U.S. 954, 113 S.Ct. 1368, 122 L.Ed.2d 746 (1993); *Griffin*, 756 S.W.2d 475; *State v.*

*Walls,* 744 S.W.2d 791 (Mo. banc), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). Considering the crime, the strength of the evidence, and the appellant, the punishment imposed is not excessive or disproportionate as compared with the penalties imposed in similar cases.

Judgments affirmed.

All concur.