**STATE of Missouri, Respondent,**

v.

**Cecil L. CLAYTON, Appellant.**

**No. 80545.**

Supreme Court of Missouri,
En Banc.

June 29, 1999.

Rehearing Denied Aug. 3, 1999.

472

Deborah B. Wafer, Office of State Public Defender, St. Louis, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. General, Cheryl Caponegro Nield, Asst. Atty. General, Jefferson City, for Respondent.

WILLIAM RAY PRICE, Jr., Judge.

A jury convicted Cecil Clayton of first-degree murder for killing Deputy Sheriff Christopher Castetter. The jury recommended, and the trial court imposed, a death sentence. Clayton now appeals his conviction and the sentence of death. Because Clayton was sentenced to death, we have exclusive jurisdiction over his appeal. MO. CONST. art. V, section 3. We affirm the judgment.

## I. FACTS

Cecil Clayton and Martha Ball had been involved in a romantic relationship and had, at times, lived together. By November 1996, their relationship was coming to an end. On November 27, 1996, Martha asked Clayton to meet her at the Country Corner, a store in Purdy, Missouri. She requested that Clayton bring some important papers she had left at his home. Clayton arrived at the store without the papers. Clayton requested that Martha go with him to his home to obtain the papers but she refused. He left and returned with the papers. Clayton was driving his blue Toyota truck with wooden sides.

When Clayton returned with the papers he asked Martha to go out to eat with him. She refused. Clayton became angry, pushed her, and the two began to argue in the store. Barbara Starkey, an employee of the store, noticed the argument and called the Barry County sheriff's depart-

ment. Jim McCracken, Purdy chief of police, responded to the call and spoke with Clayton. He lingered in the store until after Clayton left. Martha asked Chief McCracken if he would escort her to Cassville where she was staying with her mother, Dixie Seal. Before Chief McCracken could arrange the escort, Martha left the store saying that she was going to a friend's home. Martha then went to Vicky Deeter's home in Monett. Vicky testified that Martha was very scared, pale, and shaking when she arrived at her home.

After leaving the Country Corner store, Clayton went to see his friend, Martin Cole, at around 9:40 p.m. Clayton asked Martin to go with him. Martin declined because he had to drive a friend to work. Clayton became angry, raised his voice, and left.

Martha called Dixie Seal, her mother, at around 9:50 p.m. and advised her sister, Carolyn Leonard, that she was at Vicky's home. Shortly thereafter, Carolyn heard a vehicle outside, its engine running roughly. She observed the vehicle stop, back into the driveway and turn its lights off. Because there were lights across the top of the cab Carolyn surmised that the vehicle was a truck. She phoned Martha and verified that Clayton was driving the truck. Carolyn then telephoned the Barry County sheriff's department and advised them that Clayton was on their property and was not welcome. Deputy Christopher Castetter was dispatched to the Seal residence. He contacted the dispatcher when he arrived at 10:03 p.m.

Ralph Paul, Dixie Seal's neighbor, and his son-in-law, Greg Pickert, had also heard and seen the truck in Seal's driveway. Ralph phoned Mrs. Seal to inquire about the truck. They described the vehicle as a truck because of the lights across the top and noticed that it was backed into the driveway and running roughly. Shortly thereafter Ralph and Greg went back outside. The truck was gone and the two noticed a car sitting at an angle with the engine running at a high rate of speed and the tires spinning.

Deputies David Bowman and Jason Manning also heard the dispatch regarding the Seal residence and decided to go by the area to assist Deputy Castetter. When they arrived, at approximately 10:06 p.m., Deputy Castetter's patrol car was sitting at an angle against a tree in the driveway. The car's engine was still running at a high rate and the tires were spinning and smoking.

Deputy Manning approached the driver's side of the car. The window was rolled down about an inch, but was not broken. He put the car in park and turned off the engine. Deputy Castetter was leaned over in his seat. His seatbelt was not on; his weapon was still snapped in its holster; his flashlight was no longer secured in its cradle. Deputy Manning attempted to assist Deputy Castetter who was bleeding heavily from his head and having trouble breathing. Deputy Bowman contacted the dispatcher at 10:07 p.m. and advised that an ambulance was needed.

Deputy Bowman went to Mrs. Seal's home and spoke with Carolyn Leonard and Dixie Seal. Deputy Bowman then contacted the dispatcher and advised that Clayton was believed to have been driving the truck that had been in the driveway.

Deputy Castetter was transported to the hospital by helicopter. He had suffered a gunshot wound to the head, about the middle of his forehead. Despite medical treatments, Deputy Castetter died.

At about 10:10 to 10:15 p.m., Clayton returned to Martin Cole's house. Clayton asked Martin to accompany him, and the two left in Clayton's truck. While in the truck Clayton asked Cole "would you believe me, if I told you that I shot a policeman, would you believe me?" Clayton described how he shot the "cop" in the head and how Deputy Castetter then hit the accelerator and hit a tree. Clayton then took the weapon out of his overalls, point-

ed it at Martin's head, and threatened to shoot him. He asked Martin if he thought it was loaded. Clayton told Martin that he wanted him to act as an alibi and tell the police that the two had been together all afternoon and evening watching television.

At about 10:15 p.m. Chief McCracken heard a dispatch to be on the lookout for a blue Toyota truck with wooden sides driven by Clayton. McCracken recognized the description of the truck as the one driven by Clayton earlier that evening at the Country Corner store. McCracken met Chief Clint Clark of the Wheaton police department who had also heard the dispatch. The two confirmed Clayton's home address and then went to his residence.

Clayton was driving toward his home when he saw the two police cars approaching. He parked in the driveway and asked Martin "should I shoot them?" Martin answered no.

The officers activated their car spotlights, and Clayton eventually got out of his truck. The officers identified themselves. Clayton began walking toward the side of his house, advising the officers that he could not hear them. He kept his right hand in his pocket. Clayton refused to remove his hand or approach the officers. He continued toward his house, placed something in a stack of concrete blocks, and returned to his truck. Martin complied with the officers' request to get out of the truck and was apprehended. Clayton was then apprehended and transported to the sheriff's department. Martin advised the officers that Clayton had a gun. The officers located the gun in the stack of concrete blocks next to Clayton's house.

Mike Rogers of the Missouri highway patrol interviewed Clayton. Clayton's version of the events varied from complete denial to stating that Deputy Castetter "probably should have just stayed home" and that "he shouldn't have smarted off to me." Clayton then stated "but I don't know because I wasn't out there."

Following an investigation, Clayton was charged by information in the Circuit Court of Barry County with one count of murder in the first degree and one count of armed criminal action. Venue was transferred from Barry County to Jasper County. A jury found Clayton guilty of murder in the first degree and, finding three aggravating circumstances, recommended that Clayton be sentenced to death for Christopher Castetter's murder. The trial court imposed the death sentence.

## II. STANDARDS OF REVIEW

■ We review the evidence presented at trial in the light most favorable to the verdict. *State v. Storey,* 901 S.W.2d 886, 891 (Mo. banc 1995). The trial court is vested with broad discretion to admit and exclude evidence at trial. Error will be found only if this discretion was clearly abused. *State v. Simmons,* 955 S.W.2d 729, 737 (Mo. banc 1997), *cert. denied,* — U.S. —, 118 S.Ct. 1081, 140 L.Ed.2d 138 (1998).

■ On direct appeal we review the trial court "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *State v. Morrow,* 968 S.W.2d 100, 106 (Mo. banc 1998), *cert. denied,* — U.S. —, 119 S.Ct. 222, 142 L.Ed.2d 182 (1998); *State v. Hutchison,* 957 S.W.2d 757, 761 (Mo. banc 1997); *State v. Skillicorn,* 944 S.W.2d 877, 884 (Mo. banc 1997), *cert. denied,* — U.S. —, 118 S.Ct. 568, 139 L.Ed.2d 407 (1997). Issues that were not preserved may be reviewed for plain error only, requiring the court to find that manifest injustice or miscarriage of justice has resulted from the trial court error. *Simmons,* 955 S.W.2d at 737.

## III. ISSUES OF ALLEGED TRIAL COURT ERROR

Clayton raises ten points of error in his appeal. He contends the trial court erred by: 1) sustaining the state's challenge for cause to venirepersons Houston and Kingry; 2) overruling his motion to suppress evidence; 3) allowing certain statements by the prosecutor during penalty phase

closing argument; 4) allowing testimony from three witnesses that Ms. Ball was afraid of him; 5) allowing testimony from two of his cell mates regarding statements he made while awaiting trial; 6) admitting a photograph at penalty phase of the victim of an assault committed by Clayton; 7) overruling his motion for a life sentence without probation or parole; 8) using Instruction 17 at the penalty phase; 9) refusing his proposed penalty phase instruction; and 10) allowing certain statements by the prosecutor during guilt phase closing argument.

Clayton's points 3, 4, 5, 8, and 10 are not preserved for appeal, since no objection was made at trial. These points will be addressed separately, under plain error review.

### A. Preserved Issues of Alleged Trial Court Error

#### 1. Venirepersons Stricken for Cause (Clayton's point 1)

■ In his first point, Clayton alleges that the trial court erred in sustaining the state's challenge for cause to venirepersons Houston and Kingry. Venirepersons may be excluded from the jury when their views would prevent or substantially impair their ability to perform their duties as jurors in accordance with the court's instructions and their oath. *State v. Rousan*, 961 S.W.2d 831, 839 (Mo. banc 1998), *cert. denied*, —— U.S. ——, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998); *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). A juror may be stricken for cause if it appears that he or she "cannot consider the entire range of punishment, apply the proper burden of proof, or otherwise follow the court's instructions in a first degree murder case." *Rousan*, 961 S.W.2d at 839; *State v. Debler*, 856 S.W.2d 641, 645–46 (Mo. banc 1993).

■ "The qualifications of a prospective juror are not determined conclusively by a single response, 'but are made on the basis of the entire examination.' " *State v. Kreutzer*, 928 S.W.2d 854, 866 (Mo. banc 1996), *cert. denied*, 519 U.S. 1083, 117 S.Ct. 752, 136 L.Ed.2d 689 (1997) (*citing State v. Brown*, 902 S.W.2d 278, 285 (Mo. banc 1995), *cert. denied*, 516 U.S. 1031, 116 S.Ct. 679, 133 L.Ed.2d 527 (1995)). The trial court is in the best position to evaluate a venireperson's commitment to follow the law and is vested with broad discretion in determining the qualifications of prospective jurors. *See Kreutzer*, 928 S.W.2d at 866; *Rousan*, 961 S.W.2d at 839; *State v. McMillin*, 783 S.W.2d 82, 91–93 (Mo. banc 1990), *cert. denied*, 498 U.S. 881, 111 S.Ct. 225, 112 L.Ed.2d 179 (1990). A trial court's "ruling on a challenge for cause will not be disturbed on appeal unless it is clearly against the evidence and constitutes a clear abuse of discretion." *Kreutzer*, 928 S.W.2d at 866.

##### a. Venireperson Houston

■ During the state's voir dire, venireperson Houston stated that he was unsure whether he could vote for death, that he could do so in "extreme cases" only. He stated that if he did vote for death he would not mind telling the defendant. Mr. Houston stated that he could sign a death verdict, but only in "some extreme case" and he could "hardly imagine it." Mr. Houston also stated:

> I read the book 'Dead Man Walking' this nun wrote down in Louisiana. And she's kind of convincing, if you understand. Well, the death penalty is just dished out to poor people, minorities, and such as that, and it costs the state so much more money to put somebody to death than to hold them. That's – She's kind of convinced me of her thinking on that. That's how I feel.

The court sustained the state's motion to strike Mr. Houston for cause.

The record supports the trial court's ruling. The totality of Houston's statements provided a basis for the trial court to conclude that Houston's views on the death penalty would substantially impair his ability to follow the court's instructions. *See Rousan*, 961 S.W.2d at 839–40;

*Brown*, 902 S.W.2d at 285; *McMillin*, 783 S.W.2d at 93.

A trial court's determination whether to excuse a juror for cause is not dependent upon a technical evaluation of the venireperson's use of "magic" words. Instead, it is heavily weighted to the impressions of the trial court and the exercise of the court's judgment and discretion. *See Kreutzer*, 928 S.W.2d at 866; *Rousan*, 961 S.W.2d at 839; *McMillin*, 783 S.W.2d at 91–93. Here, the trial court stated:

> The Court, of course, we're down to 13 now. And the Court in observing Mr. Houston, I think it started out he could consider. When it got down those, I heard things like: not sure, hesitant, maybe in extreme cases, might be possible case. And I'll have to say, in looking at his demeanor and way he was hesitant, he took his glasses off several times, I'll have to say that the Court's impression in considering all those, I believe under Witherspoon and Witt, that I just think it would prevent him or substantially impair his performance. You know, I have the impression he's unable to faithfully in impartially apply the law in this case. The Court's going to at this time strike Number – it was Number 1 here, but it was Number 3 on the list.

This careful exercise of discretion by an experienced trial judge is precisely what is required.

The trial court did not err in striking venireperson Houston for cause.

### b. Venireperson Kingry

During the state's voir dire, venireperson Kingry expressed doubt that she could vote for the death penalty. She vacillated under questioning by the prosecution, then the defense, as to whether she could follow the law in a capital case. She stated that the "only way I could vote for it is if I had no doubt, you know, in my mind" and that she would require the prosecutor to prove the case beyond all possible doubt before she could consider the death penalty. When asked if she could sign a death verdict if she were to serve as the foreperson, she responded "no, no." The court sustained the state's motion to strike Ms. Kingry for cause.

The record supports the trial court's ruling. "A juror's equivocation about his ability to follow the law in a capital case together with an unequivocal statement that he could not sign a verdict of death can provide a basis for the trial court to exclude the venireperson from the jury." *Rousan*, 961 S.W.2d at 840; *see also State v. Smith*, 944 S.W.2d 901, 914 (Mo. banc 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 377, 139 L.Ed.2d 294 (1997); *Kreutzer*, 928 S.W.2d at 866–867. Again, this situation required the exercise of the judgment and discretion of the trial court in determining whether Ms. Kingry should have been stricken for cause. The trial court indicated its judgment by stating:

> I tell you what, I think I'm going to strike for cause, but let me tell you why. It is – she vacillated. She went back and forth. And I listened. But the whole thing seems to me is she says – And I think that probably the defense is correct, I think you rehabilitated her to the point that she says, "no, for the first stage, for guilt or innocence, it's – beyond a reasonable doubt is fine. But if I'm going to vote for the death penalty, which is one of the authorized voting, they would have to – I would have to have no doubt." And I don't think it requires no doubt. The law requires beyond a reasonable doubt on even that one. So I think on that, as I have a belief in watching her that – you know, that – I just have – you know, I have an impression that she'd be unable to apply the law in this case when it comes to second stage in the instruction.

The trial court did not err in striking venireperson Kingry for cause. Point 1 is denied.

## 2. Motion to Suppress (Clayton's point 2)

■ In his second point, Clayton contends the trial court erred by overruling his motion to suppress evidence. Clayton asserts that his arrest was not supported by probable cause and that the evidence seized after the arrest should have been suppressed. The evidence Clayton sought to suppress included statements Clayton made to Mike Rogers, of the Missouri highway patrol, a .38 caliber gun seized from outside the home, a gun holster from inside his truck, and samples of paint and rust taken from his truck.

■ To determine whether the trial court properly overruled the motion to suppress, we must determine whether the arrest was made with probable cause, since the arrest was made without a warrant. "Probable cause to arrest exists when the arresting officer's knowledge of the particular facts and circumstances is sufficient to warrant a prudent person's belief that a suspect has committed an offense." *State v. Tokar*, 918 S.W.2d 753, 767 (Mo. banc 1996), *cert. denied*, 519 U.S. 933, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). Whether there is probable cause to arrest depends on the information in the officers' possession prior to the arrest. *State v. Wiley*, 522 S.W.2d 281, 287 (Mo. banc 1975). There is no precise test for determining whether probable cause existed; rather, it is based on the particular facts and circumstances of the individual case. *Wiley*, 522 S.W.2d at 287; *State v. Pruitt*, 479 S.W.2d 785, 788 (Mo. banc 1972). "Furthermore, probable cause is determined by the collective knowledge and the facts available to all of the officers participating in the arrest; the arresting officer does not need to possess all of the available information." *State v. Mayweather*, 865 S.W.2d 672, 675 (Mo.App.1993); *see also Pruitt*, 479 S.W.2d at 788.

The record supports a finding that probable cause existed at the time of Clayton's arrest. Deputy Castetter had responded to a dispatch that a blue Toyota pickup with wooden sides had been parked in Dixie Seal's driveway. Deputies Manning and Bowman also responded to the dispatch. Upon arriving, they found Deputy Castetter's car against a tree and Deputy Castetter bleeding. Carolyn Leonard, Dixie Seal's daughter, advised the deputies that Clayton had been there in a blue Toyota pickup with wooden sides. The dispatcher then advised officers to watch for the vehicle driven by Clayton and that Deputy Castetter had been injured.

Chief McCracken heard the dispatch and recognized the description of the vehicle as the same vehicle driven by Clayton earlier in the day when he had seen Clayton at the Country Corner store. Shortly thereafter Clayton's address was verified and Chiefs McCracken and Clark went to Clayton's home. The officers were familiar with Clayton's reputation as a violent person. The officers arrived at Clayton's home just as Clayton pulled into the driveway. The officers attempted to speak with Clayton, but he acted as though he could not hear them and refused to walk toward the officers. Instead he went to the side of his home where it appeared that he placed something in a stack of cement blocks. Clayton was then restrained. The passenger in Clayton's vehicle advised the officers that Clayton had a gun in the truck. When the officers did not locate the gun in the truck, they looked in the stack of cement blocks where they located the gun. Clayton was then placed under arrest.

Based on these facts, probable cause existed at the time of Clayton's arrest. The trial court did not err in overruling Clayton's motion to suppress evidence. Point 2 is denied.

## 3. Evidence Admitted at Penalty Phase (Clayton's point 6)

■ As his sixth point, Clayton contends that the trial court erred by admitting a photograph of Mr. Dotson, the victim of a 1991 assault committed by Clayton, at penalty phase. Clayton contends that the photograph was not indic-

ative of the nature and extent of Dotson's injuries and was prejudicial. The photograph depicts Dotson's face and shirt covered with blood. Appellant was convicted of the assault in 1992.

 "The trial court is vested with broad discretion in determining the admissibility of photographs" and other evidence offered at the penalty stage of a capital case. *State v. Isa,* 850 S.W.2d 876, 890 (Mo. banc 1993); *State v. Leisure,* 749 S.W.2d 366, 379 (Mo. banc 1988), *cert. denied,* 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). The sentencer in a capital case is entitled to any evidence that assists in assessing a penalty of death. *See State v. Nicklasson,* 967 S.W.2d 596, 618 (Mo. banc 1998), *cert. denied,* ── U.S. ──, 119 S.Ct. 549, 142 L.Ed.2d 457 (1998); *State v. Chambers,* 891 S.W.2d 93, 107 (Mo. banc 1994); *State v. Parker,* 886 S.W.2d 908, 924 (Mo. banc 1994), *cert. denied,* 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995). At the penalty phase of a capital case, both the state and the defense may introduce evidence of the defendant's character, including evidence of other crimes. *See Nicklasson,* 967 S.W.2d at 618; *Chambers,* 891 S.W.2d at 106; *Parker,* 886 S.W.2d at 924.

The trial court did not err in admitting the photograph of Dotson into evidence. Officer Jerry Paul testified that he investigated the assault and that the photograph was a fair and accurate representation of Dotson immediately following the assault. He testified that Dotson suffered only a bloody nose from the assault and incurred no broken bones. Defense counsel read a stipulation that Dotson's actual injuries consisted of bruising and a cut on his nose. Point 6 is denied.

### 4. Jury Instructions (Clayton's point 9)

 As his ninth point, Clayton contends that the trial court erred in rejecting his proposed penalty phase Instruction B. Instruction B included a listing of statutory and non-statutory mitigating circumstances. Clayton contends the evidence supported the two non-statutory mitigating

factors and that the denial of the instruction prevented the jury from giving full consideration to mitigating evidence. Clayton's claim has been repeatedly rejected by this Court. *See Rousan,* 961 S.W.2d at 849; *Parker,* 886 S.W.2d at 928-29. The jury was given Instruction 19 that included all the statutory mitigating circumstances to which Clayton was entitled. Instruction 19 included a catch-all paragraph stating "you should also consider any other facts or circumstances which you find from the evidence in mitigation of punishment." The trial court did not err in refusing Clayton's Instruction B. *See State v. Copeland,* 928 S.W.2d 828, 854 (Mo. banc 1996), *cert. denied,* 519 U.S. 1126, 117 S.Ct. 981, 136 L.Ed.2d 864 (1996). Point 9 is denied.

### B. Issues of Alleged Trial Court Error Not Preserved For Appeal

 Clayton's points 3, 4, 5, 8, and 10 are not preserved for appeal, since he made no objection at trial. Clayton requests review of these points for plain error. *Rule 30.20.* "To prevail on plain error review, [Clayton] must show that the trial court's error so substantially violated his rights that manifest injustice or a miscarriage of justice results if the error is not corrected." *Parker,* 886 S.W.2d at 917.

### 1. Closing Argument (Clayton's points 3 and 10)

 Clayton contends that the trial court plainly erred in allowing certain statements by the prosecutor during his guilt and penalty phase closing arguments. *Rule 30.20.* " 'Relief should be rarely granted on assertion of *plain error* to matters contained in closing argument, for trial strategy looms as an important consideration and such assertions are generally denied without explication." *State v. Clay,* 975 S.W.2d 121, 134 (Mo. banc 1998), *cert. denied,* ── U.S. ──, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999) (*citing State v. Wood,* 719 S.W.2d 756, 759 (Mo. banc 1986)) (emphasis in original); *State v.*

*Cobb,* 875 S.W.2d 533, 537 (Mo. banc 1994), *cert. denied,* 513 U.S. 896, 115 S.Ct. 250, 130 L.Ed.2d 172 (1994) (*citing State v. Wood,* 719 S.W.2d 756, 759 (Mo. banc 1986)). Furthermore, the instructions given to the jury safeguard against harm that might otherwise result from exaggerated closing argument by either prosecutor or defendant. *State v. Owsley,* 959 S.W.2d 789, 797 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 119 S.Ct. 191, 142 L.Ed.2d 156 (1998). Under plain error review, a conviction will be reversed for improper arguments only when it is established that the argument had a decisive effect on the outcome of trial and amounts to manifest injustice. *State v. Lyons,* 951 S.W.2d 584, 596 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1082, 140 L.Ed.2d 140 (1998).

### a. Penalty Phase Closing Argument (Clayton's point 3)

 As his third point, Clayton complains about two statements made in the state's rebuttal at penalty phase. It is important to note that during its penalty phase closing argument defense counsel stated "and we live in a civilization where we should try to make the punishment fit the criminal." In its rebuttal the state responded by stating:

> I think counsel said one thing here that is interesting, in that I think it shows the fallacy of what he has suggested to you. And that is he said the punishment should fit the criminal. You will find that nowhere in our law, nowhere in our tradition. Punishment should fit the crime. That's what you'll find in our law and in our tradition. The focus should not be on the criminal, but should be on the crime, and I think that is instructive.
>
> \* \* \*
>
> Punishment here must fit the crime, and if it doesn't, then it diminishes us all. We are not here to judge Cecil Clayton as a person, we are here to punish him for the crime he's committed. There is a difference. The crime calls for the

ultimate penalty, and that's what I ask you for.

 "A prosecutor has considerable leeway to make retaliatory arguments at closing." *Parker,* 886 S.W.2d at 922. A prosecutor may retaliate to an issue raised "by the defense even if the prosecutor's comment would be improper." *State v. Walls,* 744 S.W.2d 791, 798 (Mo. banc 1988), *cert. denied,* 488 U.S. 871, 109 S.Ct. 181, 102 L.Ed.2d 150 (1988). The prosecutor's argument that the punishment should fit the crime was retaliation to defense counsel's statement that the punishment should fit the criminal since consideration of both the crime and the criminal is required to determine the appropriate sentence. *See Storey,* 901 S.W.2d at 902.

### b. Guilt and Penalty Phase Closing Arguments (Clayton's point 10)

As his tenth point, Clayton contends that the trial court plainly erred by allowing the prosecutor to make a number of arguments during his guilt and penalty phase closing arguments.

#### (i)

 During the state's closing argument at the guilt phase the prosecutor made reference to the testimony of defense expert Dr. Betty Back. Specifically, Clayton complains about the following statements:

> "Well, he didn't plan in a socially acceptable manner." Well, I've never met a criminal who did. That is not only unlikely, it's preposterous. It's absolutely preposterous.
>
> "Well, they don't have very good judgment." Well, as far as I'm concerned somebody who buys a Toyota doesn't have very good judgment because I don't like Toyotas. That doesn't mean there's anything wrong with their ability to reason. Folks, it's voodoo, that's all it is. It's an excuse.

* * * *

Folks, not only could he discriminate, he did. And right now, at this moment, he continues and hopes that he can fool you. Don't be fooled.

■ "Prosecutors may also comment on the evidence and the credibility of witnesses, even to the point of belittling and/or discussing the improbability of specific testimony." *State v. Clemons,* 946 S.W.2d 206, 229 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 416, 139 L.Ed.2d 318 (1997); *see also State v. Weaver,* 912 S.W.2d 499, 513 (Mo. banc 1995), *cert. denied,* 519 U.S. 856, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996).

### (ii)

■ Clayton complains about statements made by the prosecutor during its penalty phase closing argument. Clayton contends that the prosecutor's penalty phase closing argument went outside the evidence by suggesting that Clayton went to Dixie Seal's home to commit other crimes, by referring to his own experience as a soldier, and by stating that death was the appropriate penalty.

And certainly if he intended some ill toward anyone else, which well may have been his intent at Dixie Seal's drive after the argument he had with Martha Ball, that would have broken the law as well.

During closing argument, a prosecutor is entitled to make reasonable inferences from the evidence. *Clemons,* 946 S.W.2d at 229. While the prosecutor's statements may have suggested that Clayton went to Dixie Seal's home to commit other crimes, the statement can reasonably be inferred from the evidence presented in the case.

■ Clayton also contends that the prosecutor went outside the evidence by referring to his own experience of being a soldier.

Me, having been a soldier, I guess I can imagine reasons why a person would kill. I don't understand killing a police officer. If you'll kill a police officer, you would kill anyone. That is a figure of authority.

Taken in context, this statement was made by the prosecutor while encouraging the jury to assess the most severe penalty, the death penalty. Urging a jury to impose the most severe penalty is proper argument. *Lyons,* 951 S.W.2d at 596; *Smith,* 944 S.W.2d at 919.

■ Clayton further contends that the prosecutor's penalty phase closing argument improperly personalized and denigrated the defense. In its penalty phase closing argument defense counsel stated, "I ask you to impose a sentence of life, and not to impose a sentence of death simply because he's different or because he's defective." The prosecutor responded to this statement:

Folks, what we're dealing with here is, yes, there is value in human life, and Christopher Castetter's life had value too, a great deal of value. And he did nothing wrong. A suggestion to you that there is something wrong with you issuing a death sentence where it is called for is preposterous.

■ Again, it is proper for a prosecutor to seek and request the most severe penalty. *See Lyons,* 951 S.W.2d at 596; *Smith,* 944 S.W.2d at 919. It is also proper for a prosecutor to retaliate to statements made by defense counsel, even to the point of characterizing a defense theory as "preposterous." *See Clemons,* 946 S.W.2d at 229; *Parker,* 886 S.W.2d at 922.

### (iii)

■ Lastly, Clayton contends that the prosecutor improperly criticized him for exercising his constitutional rights.

You cannot be compared to Cecil Clayton. You have done nothing wrong. Look at all the legal niceties we have danced through to get to the point where you can make this decision. Those legal niceties were not available to Christopher Castetter because one man chose to play God.

Again, the prosecutor's argument seeks to obtain the most severe punishment. *See Lyons,* 951 S.W.2d at 596; *Smith,* 944 S.W.2d at 919. "The prosecutor's statement does not seek to punish movant for exercising his right to a trial by jury. Instead, the prosecutor's statement, read in context, highlights the nature and seriousness of the crime and movant's disregard for the law." *State v. Hall,* 955 S.W.2d 198, 209 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1375, 140 L.Ed.2d 523 (1998) (*citing Antwine v. State,* 791 S.W.2d 403, 410 (Mo. banc 1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991)); *see also Kreutzer,* 928 S.W.2d at 875.

Clayton has not established that any manifest injustice or miscarriage of justice resulted from the prosecutor's closing arguments as asserted in his points 3 and 10. Those points are denied.

## 2. Testimonial Evidence (Clayton's points 4 and 5)

Clayton contends that the trial court plainly erred in allowing witnesses to testify that Martha Ball was afraid of Clayton and that Clayton disliked law enforcement officials. These points are not preserved for appeal and review is for plain error. *Rule 30.20.*

### a. Testimony that Martha Ball feared Cecil Clayton (Clayton's point 4)

■ Clayton contends that the trial court plainly erred by allowing the testimony of Martha Ball, Vicky Deeter, and Carolyn Leonard that Martha Ball was afraid of Clayton on the night of November 27, 1996. Clayton contends that the testimony suggested that he had a propensity to do things that were bad, violent, or fearsome and may have suggested to the jury that Clayton was involved in other crimes.

Martha Ball testified, "I was scared; he pushed me one time, and he had been drinking, so I didn't want to go with him." She also stated that she did not want to go back to her mother's home "because I was afraid." Vicky Deeter testified that when Martha arrived at her home on the evening of November 27 "she was very shook up, white as a sheet and scared. She was pretty scared." She also stated that Martha "was shaking from head to toe. She had to sit down for a while before I could get her to talk. Like I said, she was just as pale as you could get." Lastly, Carolyn Leonard testified that Martha "was scared" and she knew that Martha was scared "because she told me she couldn't come home."

The evidence presented through Ball, Deeter, and Leonard "cannot be characterized as clear evidence associating [Clayton] with other crimes." *State v. Hornbuckle,* 769 S.W.2d 89, 96 (Mo. banc 1989), *cert. denied,* 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989). Rather, this testimony provided a complete and coherent picture of the crime charged. *See Harris,* 870 S.W.2d at 810; *State v. Basile,* 942 S.W.2d 342, 356 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 213, 139 L.Ed.2d 148 (1997). The testimony in question also cannot be held to have had a decisive effect on the jury, especially when coupled with Ball's testimony that she still loves Clayton and has been to visit him since his arrest. *See Basile,* 942 S.W.2d at 356.

Clayton has not established that manifest injustice or a miscarriage of justice resulted from the admission of this evidence. Point 4 is denied.

### b. Testimony that Cecil Clayton disliked law enforcement officials (Clayton's point 5)

Clayton contends that the trial court plainly erred by allowing the testimony of his jail-mates, William Rogers and Robert Compton, regarding Clayton's statements to them about the offense and about shooting the jail guards. He contends that their testimony provides evidence of other crimes and bad acts.

William Rogers testified that Clayton talked about his inability to obtain bond,

that "he wanted to get out, escape," and that he talked with Rogers about escaping. Rogers also testified that Clayton had told him about shooting the officer, that "[Clayton] walked right up to the door of the police car and shot him" and that "[Clayton] took his .38 and walked right up to the car and shot him before the other guy had a chance."

Robert Compton also testified that Clayton had talked with him about the shooting. Compton testified that

> He had told me he had shot the— Barry County Officer.

> \* \* \*

> He told me he had shot him through the window of his— police car.

> \* \* \*

> He told me it was either him or the officer, he believed that the officer was going to shoot him, and— he said the officer pulled up and he had to make a choice then. He had a pistol behind his back and he said that he just shot the cop before the cop would shoot him, and then he just made gestures, you know, acting like he had a gun in his hand.

> \* \* \*

> He didn't tell me whether he knew him or not. He told me that the officer deserved it, that he had been harassing a lot of people, and he said somebody should have shot him before that.

Compton also testified about Clayton's dislike of the other officers and jail guards.

> Did the defendant ever say anything about any other officers?
> Uh, just the officers that arrested him. His first thought was to shoot them too and go ahead and get out of state at that time. And the officers at Lawrence County Jail.

Compton testified that Clayton wanted to escape and had attempted to unlock the turnkey with a piece of metal, that he wanted Compton's assistance in getting out of the country, and that Clayton stated

that the jail guards "deserved to, you know, have it done to them too."

■ Clayton's statements concerning Deputy Castetter are admissions of the crime and admissible without question. These statements have nothing to do with other crimes or uncharged bad acts.

■ The evidence regarding talk of escape was relevant in that it tended to show a consciousness of guilt. *See State v. Driscoll,* 711 S.W.2d 512, 517 (Mo. banc 1986), *cert. denied,* 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986).

■ Likewise, evidence regarding Clayton's dislike of the jail guards and law enforcement officers does not necessarily constitute evidence of another crime. *See Hornbuckle,* 769 S.W.2d at 96. This testimonial evidence was relevant to establish Clayton's motive in shooting Officer Castetter. The state's theory of motive was that Clayton had a problem with law enforcement officers in general and that he shot Officer Castetter to avoid arrest and the revocation of his probation. *See State v. Mallett,* 732 S.W.2d 527, 534 (Mo. banc 1987), *cert. denied,* 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). "Wide latitude is generally allowed in the development of evidence of motive." *Mallett,* 732 S.W.2d at 533.

Lastly, Clayton contends that his jailmates' testimony about the shooting provided evidence of the element of deliberation that was otherwise nonexistent. Direct proof of a required mental state is seldom available. *See Simmons,* 955 S.W.2d at 739; *State v. Turner,* 623 S.W.2d 4, 7 (Mo. banc 1981), *cert. denied,* 456 U.S. 931, 102 S.Ct. 1982, 72 L.Ed.2d 448 (1982). A mental state "may be proved by indirect evidence and inferences reasonably drawn from circumstances surrounding the slaying." *Turner,* 623 S.W.2d at 7; *Simmons,* 955 S.W.2d at 739.

Clayton has not established that admission of this evidence resulted in manifest injustice or a miscarriage of justice. Point 5 is denied.

### 3. Penalty Phase Instruction 17 (Clayton's point 8)

■ In his eighth point Clayton contends that the trial court erred in submitting Instruction 17 because it contained statutory aggravators not supported by the evidence. Clayton failed to object to Instruction 17 at the penalty phase instruction conference or at any prior time. Clayton also failed to set forth the instruction in full in the argument portion of his brief. *Rule 30.06(e); State v. Oxford,* 791 S.W.2d 396, 400 (Mo. banc 1990), *cert. denied,* 498 U.S. 1055, 111 S.Ct. 769, 112 L.Ed.2d 789 (1991). This point is not preserved for appeal and review is for plain error. *Rule 30.20.*

Instruction 17 provides:

In determining the punishment to be assessed against the defendant for the murder of Christopher Castetter, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exist:

(1) whether the defendant was convicted of Assault in the Second Degree on September 14th, 1991 in the Circuit Court of Barry County of the State of Missouri.

(2) Whether Christopher Castetter was a peace officer, and whether that murder was committed during the exercise of his official duty.

(3) Whether the murder of Christopher Castetter involved depravity of mind, and whether as a result thereof the murder was outrageously and wantonly vile, horrible and inhumane.

You can make a finding of the depravity of mind only if you find that the defendant's selection of the person killed was random and without regard to the victim's identity, and that defendant's killing of Christopher Castetter thereby exhibited a callous disregard for the sanctity of all human life.

(4) Whether the murder of Christopher Castetter was committed for the purpose of avoiding the lawful arrest of defendant.

You are further instructed that the burden rests upon the state to prove at least one of the foregoing circumstances beyond a reasonable doubt. On each circumstance that you find beyond a reasonable doubt, all 12 of you must agree as to the existence of that circumstance. Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing statutory aggravating circumstances exists, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the corrections without eligibility for probation or parole.

■ The part of the instruction about which Clayton complains is that involving "depravity of mind" which could only be found if the killing of the victim was at random and without regard to his identity. Clayton asserts that this aggravating circumstance was not supported by the evidence; that a finding that he killed Castetter because he was a law enforcement officer and that he killed Castetter at "random and without regard to his identity" are mutually exclusive and cannot coexist.

■ Clayton's argument is incorrect. The jury determined that aggravating circumstances numbers 1, 2, and 3 existed beyond a reasonable doubt. The jury did not find the fourth aggravator. Aggravator 2 merely requires a finding that Deputy Castetter "was a peace officer" and was killed "during the exercise of his official duty." Nothing within this finding is necessarily inconsistent with a finding that Castetter was also killed at "random and without regard to his identity." Killing a person merely because that person is a law enforcement officer does not negate a finding of randomness, unless a particular purpose is also found specific to the identity of the individual victim. Even had the jury also found aggravator 4, which it did not, the mere fact that Deputy Castetter was killed to avoid Clayton's being arrested by him might have related solely to Castetter's duties as a law enforcement officer

and not to his identity as a person. *See State v. Cornman,* 695 S.W.2d 443, 448 (Mo. banc 1985). Point 8 is denied.

### C. Death Sentence Proportionality Review (Clayton's point 7)

As his seventh point, Clayton contends that the trial court erred in overruling his motion for a directed verdict for life without parole and that the death sentence is disproportionate under section 565.035.3.

Section 565.035 requires us to independently review the sentence of death to determine (1) whether it was imposed under the influence of passion or prejudice, or any other arbitrary factor; (2) whether there was sufficient evidence to support the finding of statutory aggravating circumstances and any other circumstance found; and (3) whether the sentence was excessive or disproportionate to the penalty imposed in similar cases.

There is no evidence that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

We next review the trial court's findings to determine if the evidence supports – beyond a reasonable doubt – the existence of an aggravating circumstance and any other circumstance found. Section 565.035.3(2); *Brown,* 902 S.W.2d at 294. The jury unanimously found three statutory aggravators in the murder of Officer Castetter. The evidence supports, beyond a reasonable doubt, a finding that Clayton had been convicted of an assault in 1992, that the murder was committed against a peace officer while engaged in the performance of his official duty, and that the killing was random and without regard to Deputy Castetter's individual identity. Clayton does not contest that the evidence supports a finding of the first two of these statutory aggravating circumstances.

█ Lastly, we must determine whether the sentence of death is excessive or disproportionate. Section 565.035.3(3). In making this determination, we consider similar cases where the death penalty was imposed. Section 565.035.3(3); *Nicklas-*

*son,* 967 S.W.2d at 622. The death sentence in this case is neither excessive nor disproportionate to the penalty imposed in similar cases. This Court has upheld sentences of death where the defendant commits an execution-style shooting of a defenseless victim. *See Nicklasson,* 967 S.W.2d at 622; *State v. Whitfield,* 939 S.W.2d 361, 372 (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 97, 139 L.Ed.2d 52 (1997). This Court has also upheld sentences of death in numerous cases involving killings of peace officers, law enforcement, or correction officers. *See State v. Johnson,* 968 S.W.2d 123, 135 (Mo. banc 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998); *State v. Sweet,* 796 S.W.2d 607, 617 (Mo. banc 1990), *cert. denied,* 499 U.S. 932, 111 S.Ct. 1339, 113 L.Ed.2d 270 (1991); *Mallett,* 732 S.W.2d at 542–43; *Driscoll,* 711 S.W.2d at 517–18. In light of the crime and the strength of the evidence against him, Clayton's sentence of death is not excessive or disproportionate.

█ Clayton particularly asks that we overturn his sentence of death because evidence of deliberation was supplied only by two jail-house snitches. Evidence of deliberation was also supplied, however, by the circumstances of the case, that Deputy Castetter was shot in the forehead at point blank range, with his own pistol still in his holster. Clayton also particularly asks that we consider his mental disabilities in determining whether the sentence of death is appropriate. We find that the record as a whole supports the sentence of death as recommended by the jury and imposed by the judge. Clayton's point 7 is denied.

## IV. CONCLUSION

The judgment is affirmed.

All concur.